# In the United States Court of Federal Claims

| | |
|---|---|
| FYI-FOR YOUR INFORMATION, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>C EVANS CONSULTING LLC,<br><br>Intervenor-Defendant. | No. 26-cv-0032<br><br>Filed Under Seal: August 24, 2026<br><br>Publication: September 10, 2026[1] |

*Craig A. Holman* of Arnold & Porter Kaye Scholer LLP, Washington, D.C., argued for Plaintiff. With him on the briefs were *Roee Talmor* and *Dustin Vesey* of Arnold & Porter Kaye Scholer LLP, Washington, D.C.

*Blake W. Cowman* of the United States Department of Justice, Civil Division, Washington, D.C., argued for Defendant. With him on the briefs were *Douglas K. Mickle, Patricia M. McCarthy*, and *Brett A. Shumate* of the United States Department of Justice, Civil Division, Washington, D.C., and *James E. Hicks* of the Drug Enforcement Administration.

*Ryan C. Bradel* of Ward & Berry, PLLC, Washington, D.C., argued for Intervenor-Defendant. With him on the briefs were *Nicholas L. Perry, P. Tyson Marx,* and *Steffanie Lee* of Ward & Berry, PLLC, Washington, D.C.

[1] This Memorandum and Order was filed under seal on August 24, 2026, in accordance with the Protective Order entered in this case. *See* ECF No. 7. On September 8, 2026, the parties filed a Final Consensus Proposed Redacted Version proposing redactions to the Memorandum and Order. The sealed and public versions of this Memorandum and Order are identical, except for redactions, this footnote, and the addition of the publication date.

**MEMORANDUM AND ORDER**

This post-award bid protest involves the delayed receipt of a quoter's email, a raft of alleged evaluation errors, and an agency best value tradeoff evaluation justifying payment of a 0.78% higher price for a higher-rated proposal. In June 2025, Plaintiff FYI-For Your Information, Inc. (Plaintiff or FYI) submitted a quote for a contract to provide Human Capital Support Services for the Drug Enforcement Administration (DEA), an agency within the United States Department of Justice (DOJ). FYI, the incumbent contractor for this service, and Intervenor-Defendant C Evans Consulting LLC (Intervenor or CEC) each received the highest adjectival ratings available in DEA's evaluation. FYI proposed a slightly lower price than CEC—0.78% lower. However, the DEA determined that CEC's quote provided benefits above and beyond what the adjectival ratings reflected, and that those benefits outweighed CEC's slightly higher price. Accordingly, the DEA awarded CEC the contract under this Subpart 8.4 procurement.

FYI, in turn, lodged this protest, challenging the award's rationality and compliance with procurement law. FYI first argues that a delay in receipt caused by DEA's email server should have disqualified CEC's quotation as late. In response to a request from the Contracting Officer (CO), CEC clarified an obvious miscalculation in its quotation. To clarify and correct this miscalculation, CEC modified several tables in its quotation. The CO directed CEC to "[p]lease reply to this email confirming your original submission or by submitting a corrected copy not later than 1:30PM, ET, today, June 4, 2025, in order for your quote to be considered." Tab 14c, Administrative Record (AR) 704. CEC's president hit the send button on its email containing the modification at 1:01 p.m. on June 4, 2025. However, due to an email security software hold, CEC's email did not arrive in the CO's inbox until 1:48 p.m. that day.

FYI argues that DEA could not consider CEC's modifications because the email arrived in the DEA CO's inbox after the deadline. The Court agrees. Applicable law is clear and direct here. As explained further below, the Federal Acquisition Regulation (FAR) classifies CEC's reply to DEA as a modification since CEC changed its quotation to correct a mistake. The "late-is-late rule," which applies to this procurement, mandates a strict lateness rule for the receipt of "[a]ny offer, modification, revision, or withdrawal of an offer." FAR 52.212-1(f)(2)(i). The CO received CEC's email, containing the modified quotation, after the 1:30 p.m. deadline. While exceptions to the "late-is-late rule" exist, at oral argument Defendant disavowed the government control exception, which potentially could have permitted DEA to consider CEC's modified quotation. With Defendant's unequivocal disavowal, however, no exception is available here; the late-is-late rule imposes a bright line rule, and FYI demonstrates success on the merits based on a violation of the rule. Simply put, under the facts in this record, DEA was not permitted to consider CEC's modified quotation in making its award decision.

Although FYI succeeds on the merits based on DEA's violation of the late-is-late rule, for completeness the Court evaluates, and rejects, FYI's other challenges to DEA's evaluation. First, FYI challenges DEA's assessment of each of the three non-price factors in the evaluation, through which DEA determined that CEC offered a superior proposal. FYI disagrees with DEA about which quote offered a superior technical solution; however, Congress has assigned DEA, not this Court, the power to decide what presents the most value to the Government. DEA's Technical Evaluation Panel (TEP) and CO each analyzed the quotes in detail and explained why CEC provided a better technical solution across the non-price factors. As this Court will not disturb a rational and reasonably explained evaluation, FYI's arguments challenging the evaluation of each

factor fail. This Court's role is to ensure that the agency has rationally made and explained its decision in accordance with procurement law, and DEA did so here.

Next, FYI challenges DEA's best value tradeoff as irrational. FYI and CEC received the same adjectival scores, but FYI's TEP and CO each determined that CEC presented a technically superior quote. FYI's quoted price was 0.78% less than CEC's quoted price. The CO determined that the technical advantages justified the higher price. The Court finds that DEA rationally, albeit briefly, explained that CEC's technical advantages justified its slightly higher price. An agency's discretion reaches its zenith in the best value determination, and the Court declines to disturb DEA's rationally justified determination.

Finally, injunctive relief is appropriate in this situation, where DEA contravened procurement law, FYI faces irreparable harm if the violation is not corrected, and the public interest favors proper compliance with procurement law. Accordingly, the Court enjoins the DEA from proceeding with its award to CEC under the present Request for Quotation to the extent the award is based on the unlawful consideration of CEC's modified quotation. The DEA shall retain discretion to determine how it will otherwise proceed, if at all, with its procurement of Human Capital Support Services.

For the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 24). The Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 30) and **GRANTS IN PART** and **DENIES IN PART** Intervenor-Defendant CEC's Cross-Motion for Judgment on the Administrative Record (ECF No. 28).

## BACKGROUND

### I. The Request for Quotation

DEA's Human Resource Division is responsible for "providing human capital strategies and tools for recruiting, hiring, developing, retaining, and transitioning a highly skilled and high-performing workforce to support mission accomplishments." Tab 11, Administrative Record (AR) 251. In support of that mission, DEA hires contractors to provide "Human Resources (HR) Operational Activities." *Id.*

On May 2, 2025, the Drug Enforcement Administration (DEA) issued a Request for Quotation (RFQ) seeking "Human Capital Support Services."[2] Tab 10, AR 99, Tab 11, AR 222. DEA subsequently issued three amendments to the RFQ. *See* AR Tabs 11–13. The RFQ aimed to award a single Time and Materials (T&M)/Labor Hour (LH) blanket purchase agreement under the streamlined acquisition procedures of FAR Subpart 8.4. Tab 11, AR 285. The procurement was designated as a set-aside for a Women-Owned Small Business with a General Services Administration (GSA) Federal Supply Schedule (FSS) contract. Tab 11, AR 245. Generally, the contractor's responsibilities "include position classification, recruitment, internal placement, employee relations, benefits and services, collecting and processing data, and record keeping." Tab 11, AR 251. The RFQ predicted that a contractor would need 10-35 employees across various labor categories to perform under the contract. Tab 11, AR 266. The RFQ anticipated award of a one-year contract with a one-year option period, so that performance "shall not exceed a maximum of twenty-four (24) consecutive months from date of award." Tab 11, AR 240. The RFQ also incorporated FAR 52.212-1. Tab 11, AR 276, 317.

---

[2] References to the "RFQ" are to the RFQ as originally published, *see* Tab 10, AR 99–221, and RFQ Amendment 1, *see* Tab 11, AR 222–347. Some documents in the Administrative Record also refer to the RFQ as the "Solicitation" or "solicitation." *See, e.g.,* Tab 18d, AR 1146.

The RFQ required quoters to submit two volumes in their quote: Volume I was the "Technical Quote," and Volume II was the "Business Quote." Tab 11, AR 277. Volume I addressed the requirements of the Statement of Work (SOW) and required each quoter to explain its "capabilities and the means to be used to satisfy the requirements." *Id.* Specifically, Volume I covered three factors: Factor 1, Technical Capability (Factor 1); Factor 2, Transition Phase-in/Transition Phase-out (Factor 2); Factor 3, Past Performance (Factor 3). Tab 11, AR 278. For Factor 1, each quoter was required to "demonstrate its technical capability to accomplish or satisfy each of the tasks in the SOW." *Id.* DEA instructed that each Factor 1 description must be "specific, detailed, and complete enough to clearly and fully demonstrate an understanding of the requirement." *Id.* Among other requirements, each offeror had to "demonstrate the ability to provide high-volume recruitment and onboarding support under tight deadlines." *Id.*

For Factor 2, each offeror would "demonstrate its ability to implement a transition plan without impacting the operations of the program during the phase-in and phase-out periods during the contract performance." *Id.* Factor 2 included two subfactors: Transition Phase-in and Transition Phase-out. Tab 11, AR 278–79. For Transition Phase-in, requirements included "Monitoring and Reporting of Transition Progress" at the start of the quoter's performance. Tab 11, AR 279. For Transition Phase-out, the RFQ required quoters to present a plan for the transition-out period "in the event that the Quoter is not selected for a follow-on award." Tab 11, AR 279.

Finally, Factor 3 directed quoters to "provide examples of real work with actual results of the prime contractor and major subcontractor(s) to perform the requirements as described in the solicitation." Tab 11, AR 279. Specifically, each quoter was directed to "provide a list of up to three (3) successful contracts with past performance history from the past three (3) years that are

representative of the Quoter's capability to provide services with similar scope, magnitude, and complexity to that stated in the SOW." *Id.* The RFQ stated that DEA could, but was not bound to, consider past performance information from a variety of sources:

> The Government will supplement the information provided by the Quoter with information the Government obtains through reference checks, its own knowledge/experience, and/or from other sources. These sources may include, but not necessarily be limited to, other Government contracting offices and Performance Assessment Reporting System (CPARS), FAPIIS, etc. Past performance will be a subjective assessment based upon all relevant facts and circumstances including contract past performance for smaller requirements.

Tab 11, AR 280.

Volume II, the Business Quote, included a price quote. Tab 11, AR 280. "Price quote shall include a price for each and every [Contract Line Item Number (CLIN)], on an all or none basis, multiplied by the estimated quantity per CLIN and sum of all CLINs per year in accordance with the Schedule of Supplies." *Id.* The RFQ specified the pricing information that DEA would use to assess each bid: "[t]he Quoter shall propose a price per contract line item number (CLIN) and fill in the unit prices." *Id.* Attached to the RFQ was a Schedule of Supplies/Services, which listed the 20 CLINs that each quote must include. Tab 11, AR 246–47. Each CLIN corresponded to a labor category within the RFQ; quotes had to provide a unit price (dollars per hour worked) for each labor category. *Id.* Notable to the present case, the RFQ specified the quantity (number of hours) that the quote had to include. *See id.* For example, for CLIN 0005, Classification Specialist, the RFQ mandated that quotes would propose 7,680 hours as the quantity, then each quoter had to fill in the unit price and the total amount, which would equal 7,680 hours multiplied by the contractor-supplied unit price. *See* Tab 11, AR 246.

## II. The Evaluation Criteria

In the RFQ, DEA stated that it would make a best value tradeoff to determine the "responsive, responsible Quoter whose quote is most advantageous to the Government, price and other factors considered." Tab 11, AR 288. More specifically, the RFQ stated that DEA would evaluate all compliant quotes "to determine the relative merits" of each quote to accomplish Factor 1, Factor 2, and Factor 3. Tab 11, AR 285. The RFQ listed the technical factors in descending order of importance: Factor 1 was the most important, followed by Factor 2, and Factor 3 was the least important. Tab 11, AR 285. The technical evaluation was designed to assess "the degree to which the proposed approach meets or does not meet the minimum performance or capability requirements through an assessment of strengths, weaknesses, deficiencies, and risks of a quote." Tab 11, AR 286.

Regarding Factors 1 and 2, evaluators assigned a rating of High Confidence, Some Confidence, or Low Confidence to each quote:

| | |
|---|---|
| **High Confidence** | The Government has *high confidence* that the Quoter understands the requirement, proposes a sound approach, and will be successful in performing the contract with *little or no* Government intervention. |
| **Some Confidence** | The Government has *some confidence* that the Quoter understands the requirement, proposes a sound approach, and will be successful in performing the contract with *some* Government intervention. |
| **Low Confidence** | The Government has *low confidence* that the Quoter understands the requirement, proposes a sound approach, or will be successful in performing the contract *even with* Government intervention. |

Tab 11, AR 286 (emphasis in original). The RFQ stated that "[t]he Government will evaluate the Quoter's quote for specificity, detail, and completeness to clarify and fully demonstrate an understanding of the requirement." Tab 11, AR 286.

Regarding Factor 3, past performance, the RFQ stated that evaluators would evaluate "the Quoter's capability to provide services with similar scope, magnitude, and complexity to that stated in the SOW." Tab 11, AR 288. The evaluators assigned each quote a rating of Acceptable, Unacceptable, or Neutral for Factor 3:

| | |
|---|---|
| **Acceptable** | The Quoter's submission demonstrates same/similar requirement, and *will be* successful in performing the contract. |
| **Unacceptable** | The Quoter's submission *does not* demonstrate same/similar requirement, and *will not* be successful in performing the contract. |
| **Neutral** | The Quoter's submission of past performance record is neither recent nor relevant and does not count favorably nor unfavorably. |

Tab 11, AR 286 (emphasis in original).

The RFQ stated that price was less important than technical ability in the best value tradeoff:

> All evaluation factors other than cost/price, when combined, are significantly more important than cost or price. As technical differences narrow between quotes, cost/price will become more important. If there are no significant technical differences between quotes, cost/price alone may be the determining factor for source selection. Award will be based on Best Value Trade-Off method.

Tab 11, AR 288.

## III. The Competition

The RFQ directed each offeror to email its quote to the CO by 10:00 a.m. on June 2, 2025. Tab 11, AR 282. On May 30, 2025, CEC submitted its quote to the CO at 1:48 p.m. Tab 14a, AR 363. On June 1, 2025, FYI submitted its quote to the CO at 9:37 p.m. Tab 15a, AR 896.

DEA received 19 proposals in response to the RFQ, including the proposals from CEC and FYI. Tab 24, AR 1173. DEA disqualified six quoters for failure to comply with instructions. Tab 24, AR 1176.

## IV. CEC's Clarifications Email

On June 4, 2025, at 11:23 a.m., the CO emailed CEC's President to inform her that there "appear[ed] to be calculation discrepancies" in the Business Quote. Tab 14c, AR 704. "Please clarify if the calculations/totals are correct," the CO wrote. *Id.* The CO requested a response by 1:30 p.m. on that same day: "[p]lease reply to this email confirming your initial submission or by submitting a corrected copy not later than 1:30PM, ET, today, June 4, 2025, in order for your quote to be considered." *Id.* DEA solicited clarifications from four other quoters, besides CEC, to correct "calculation discrepancies" in their business quotes. Tab 24, AR 1176.

CEC appears to have made calculation errors for CLIN 0005 in its original bid. In the Schedule of Supplies/Services, CEC wrote that it would provide 7,680 hours of work for CLIN 0005 (as the RFQ required), at a rate of $[redacted] per hour. Tab 11, AR 246 (requiring 7,680 hours), Tab 14b, AR 367 (quoting 7,680 hours). The Schedule of Supplies/Services for CEC's initial proposal wrote that the amount for CLIN 0005 would be $[redacted]; however, the quantity multiplied by the quoted unit price should have led to a total of $[redacted]. *See id.* CEC also offered the wrong number of hours for CLIN 0005 in a page of the quotation explaining base year pricing:

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| 0001 | HR Specialist Jr./Technical Specialist | 5,760 | [redacted] | [redacted] |
| 0002 | Administrative Assistant II | 9,600 | [redacted] | [redacted] |
| 0003 | Program Support Specialist | 1,920 | [redacted] | [redacted] |

| | | | | |
|---|---|---|---|---|
| 0004 | Administrative Assistant I | 3,840 | [redacted] | [redacted] |
| 0005 | Classification Specialist | **5,760** | [redacted] | [redacted] |
| 0006 | Senior Recruiter/HR Specialist | 5,760 | [redacted] | [redacted] |
| 0007 | Human Resources Assistant | 23,040 | [redacted] | [redacted] |
| 0008 | Project Specialist | 1,920 | [redacted] | [redacted] |
| 0009 | Program Analyst | 1,920 | [redacted] | [redacted] |
| 0010 | Program Manager | 1,920 | [redacted] | [redacted] |
| | Base Year Total | 61,440 | | [redacted] |

Tab 14b, AR 548 (emphasis added). CEC stated that it would provide CLIN 0005 at a unit price of $[redacted] and a total price of $[redacted]; however, CEC said that it would only provide 5,760 hours for that CLIN, which did not meet contract requirements. Tab 14b, AR 548. Instead, the RFQ required each quoter to propose 7,680 hours for CLIN 0005. *See* Tab 11, AR 246.

The CO's request for clarification from CEC appears to reference these discrepancies. *See* Tab 14c, AR 704. CEC responded to the CO's email on June 4, 2025, as directed: "[t]hank you for the opportunity to correct the calculation discrepancies. Attached please find the corrected calculations in the associated volumes." Tab 14c, AR 705. In the clarification, CEC adjusted the quantity and amount for CLIN 0005 to match RFQ requirements:

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| 0001 | HR Specialist Jr./Technical Specialist | 5,760 | [redacted] | [redacted] |
| 0002 | Administrative Assistant II | 9,600 | [redacted] | [redacted] |
| 0003 | Program Support Specialist | 1,920 | [redacted] | [redacted] |
| 0004 | Administrative Assistant I | 3,840 | [redacted] | [redacted] |
| 0005 | Classification Specialist | **7,680** | [redacted] | [redacted] |
| 0006 | Senior Recruiter/HR Specialist | 5,760 | [redacted] | [redacted] |
| 0007 | Human Resources Assistant | 23,040 | [redacted] | [redacted] |

| | | | | |
|---|---|---|---|---|
| 0008 | Project Specialist | 1,920 | [redacted] | [redacted] |
| 0009 | Program Analyst | 1,920 | [redacted] | [redacted] |
| 0010 | Program Manager | 1,920 | [redacted] | [redacted] |
| | Base Year Total | 61,440[3] | | [redacted] |

Tab 14c, AR 716 (emphasis added).

CEC sent the email with its corrected quote at 1:01 p.m.—before the 1:30 p.m. deadline. Tab 56, AR 2584. However, the DOJ Proofpoint perimeter device, which is "designed to protect organizations and their employees from cyber threats" at the DEA and other DOJ components, held CEC's email for 42 minutes, during which time CEC's email did not arrive in the CO's inbox. *Id.* at 2584–85. CEC's corrected quote appeared in the CO's inbox at 1:44 p.m.—after the 1:30 p.m. deadline. *Id.* The DOJ later found that "[t]he emails were delayed in passing through Proofpoint due to technical errors." Tab 56, AR 2585.

### V. Evaluation and Award

Following the clarifications, DEA convened a Technical Evaluation Panel to conduct a technical analysis, in which six of the 13 remaining quoters received the top adjectival ratings available in the procurement: high confidence scores for Factor 1 and Factor 2 and an acceptable rating for Factor 3. Tab 24, AR 1177. FYI and CEC were among the six quoters who received the highest adjectival ratings. *Id.*; *see* Tab 18a, AR 1134–38 (CEC technical evaluation), Tab 18b, AR 1139–43 (FYI technical evaluation). Following its evaluation of the 13 compliant quotes, the Technical Evaluation Panel informed the CO that CEC presented the best technical option for DEA: "[w]hile there were several qualified quoters, this one emerged as the best option for the DEA in connection with this solicitation." Tab 18d, AR 1146.

---

[3] CEC failed to update this cell in its post-clarifications quote. *See* Tab 14c, AR 716.

FYI and CEC submitted the two lowest prices of the quoters receiving the highest adjectival ratings, and both quotes were less than the Independent Government Cost Estimate (IGCE):

| Offeror | Base Period | Option Period 1 | Total |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| **CEC** | [redacted] | [redacted] | **$9,313,152.00** |
| **FYI** | [redacted] | [redacted] | **$9,240,633.60** |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |

*See* Tab 19, AR 1152 (pricing), Tab 24, AR 1177 (highest rated quoters).[4] FYI's quote cost $72,518.40 less than CEC's quote, or a difference of 0.78%. *See* Tab 19, AR 1156.

The CO prepared an Award Decision Memo, in which she evaluated each compliant quote and explained the procurement process. Tab 24, AR 1173–90. The CO offered a detailed analysis of CEC's proposal:

> The Technical Evaluation Panel (TEP) thoroughly reviewed and rated the technical quote submitted by C. Evans Consulting, LLC. The TEP designated C. Evans Consulting, LLC with a rating of High Confidence, indicating that little to no government intervention is anticipated for successful performance of the work. Consequently, C. Evans Consulting, LLC was determined to be Technically Acceptable. The TEP found that C. Evans Consulting, LLC demonstrated high confidence based on their extensive knowledge in human capital support services. Their technical approach comprehensively addressed all the aspects of the Statement of Work (SOW), detailing each task and deliverable. C. Evans Consulting, LLC has significant experience in providing human resource staffing of similar size, scope, and complexity, including other large contracts. The evaluators rated the overall proposal as High, noting that it was generally impressive. Additionally, C. Evans exceeded SOW section 6.0(h) applicant inquiries of 200 per month by proven surge capability of 28,000 applicant inquiries per month and offered capability for customized dashboards to track project progress during the transition phases exceeding the minimum requirements of the RFQ. DEA has high confidence that the quoter will not only meet but exceed the

[4] This table contains the proposed prices only for offerors that received "HIGH CONFIDENCE" ratings for Factors 1 and 2 and an "ACCEPTABLE" rating for Factor 3. *See* Tab 24, AR 1177. The Independent Government Cost Estimate (IGCE) is also included.

> DEA's needs. Based on C. Evans explicitly detailed approach and lower labor costs, C. Evans, LLC offers the government value above and beyond.

Tab 24, AR 1178. The CO offered a similarly detailed analysis of FYI's quote:

> The TEP thoroughly reviewed and rated the technical quote submitted by FYI. The TEP designated FYI with a rating of High Confidence, indicating that little to no government intervention is anticipated for successful performance of the work. Consequently, FYI was determined to be Technically Acceptable. The TEP found that FYI has demonstrated proficiency performing core human capital support services. Their technical approach addressed all the aspects of the SOW, addressing each task and deliverable. FYI demonstrated experience in providing human resource staffing of similar size, scope, and complexity, including other large contracts. The evaluators rated the overall proposal as High, meeting the minimum requirement of the RFQ, noting that as the incumbent, there is no requirement for a transition period.

Tab 24, AR 1180. After these individualized assessments of each quoter's technical evaluation and a comparison of line-item prices offered by each quoter, the CO wrote one paragraph directly referencing the best value tradeoff: "[t]he High Confidence rating of C. [Evans] Consulting, LLC's quote across all non-price factors along with their exceeding requirements offsets the higher price of their quote when compared to lower priced proposals which received equal or lower confidence level ratings across the non-price factors." Tab 24, AR 1189.

On July 17, 2025, DEA notified FYI that it had awarded CEC the contract. Tab 23a, AR 1168–69.

## VI. GAO Protest

On July 28, 2025, FYI filed a post-award protest before the Government Accountability Office (GAO). Tab 29, AR 1286. The post-award protest challenged DEA's technical evaluation of the three factors and the resulting best value tradeoff determination. Tab 29, AR 1287–88. On September 4, 2025, FYI filed a supplemental GAO protest which raised new challenges to DEA's award. Tab 41, AR 2387. As the record available to FYI was more limited before the GAO, FYI's

current late-is-late rule argument was not pertinent to the GAO proceeding. On December 12, 2025, GAO denied FYI's protest. Tab 48, AR 2550–61.

**PROCEDURAL HISTORY**

On January 9, 2026, Plaintiff filed its Complaint, and on January 21, 2026, the Court issued a Scheduling Order that included a briefing schedule and an oral argument date. ECF Nos. 1 (Complaint); 20 (Scheduling Order). Defendant submitted the AR on February 9, 2026, consistent with the Scheduling Order. Scheduling Order at 1; ECF No. 22.

On February 23, 2026, Plaintiff filed its Motion for Judgment on the Administrative Record and accompanying Memorandum of Law. ECF Nos. 24, 24-1 (Pl. MJAR). Plaintiff also filed an Amended Complaint on the same day as its MJAR. ECF No. 23 (Amended Complaint). Plaintiff argued that the AR revealed that CEC had submitted its June 4 email late and accordingly CEC should have been disqualified. Pl. MJAR at 17[5] ("The DEA's failure to exclude CEC or even to consider CEC's noncompliance prejudiced FYI, the rightful awardee.").

On March 7, 2026, Defendant filed a Motion for Leave to Correct and Supplement the Administrative Record, which Plaintiff opposed. ECF No. 27 at 1. On March 9, 2026, Defendant filed its Cross-Motion for Judgment on the Administrative Record and Response to Plaintiff's MJAR. ECF No. 30 (Def. MJAR). On the same day, CEC filed its own Cross-Motion for Judgment on the Administrative Record and Response to Plaintiff's MJAR. ECF No. 28 (CEC MJAR) (collectively, with Pl. MJAR and Def. MJAR, the MJARs).

On March 10, 2026, the Court stayed further briefing on the MJARs to brief and resolve Defendant's Motion for Leave to Correct and Supplement the Administrative Record. ECF No.

[5] Citations throughout this Memorandum and Order correspond to the ECF-assigned page numbers, which do not always correspond to the pagination within the document.

32 at 3 ("The Court will consider the arguments concerning the supplementation of the record prior to ruling upon the Motions for Judgment on the Administrative Record, as Defendant and Intervenor-Defendant seek to rely upon documents subject to the Motion to Supplement.").

On March 12, 2026, Defendant filed a Corrected Motion for Leave to Correct and Supplement the Administrative Record. ECF No. 34 (Corrected Motion to Supplement). On March 19, 2026, Plaintiff filed its opposition to the Corrected Motion to Supplement. ECF No. 36. On March 25, 2026, Defendant and CEC submitted their respective Replies in support of the Corrected Motion to Supplement. ECF Nos. 40, 41.

On March 24, 2026, Defendant filed a Motion for Voluntary Remand. ECF No. 39. On April 1, 2026, Plaintiff filed a Response in opposition to the Motion for Voluntary Remand, and on April 6, 2026, Defendant filed a Reply in support of the Motion for Voluntary Remand. ECF Nos. 42, 44. CEC did not file a brief related to Defendant's Motion for Voluntary Remand.

On May 19, 2026, the Court conducted oral argument on Defendant's Corrected Motion for Leave to Correct and Supplement the Administrative Record and its Motion for Voluntary Remand. *See* Minute Entry, dated May 19, 2026. On May 20, 2026, the Court denied Defendant's Motion for Voluntary Remand and granted in part and denied in part its Motion for Leave to Correct and Supplement the Administrative Record. *See* Minute Entry, dated May 20, 2026; ECF No. 47 at 1. The Court ordered the parties to propose a "schedule for any proposed Consent Motion to Supplement the Administrative Record with information about control over the Proofpoint email server at issue in this action." *Id.* at 2.

On May 27, 2026, the parties confirmed in a Joint Status Report that the DEA's voluntary partial stay of the underlying award would extend "through August 24, 2026." ECF No. 49 at 2.

The parties also proposed a schedule for further briefing, which the Court adopted. *Id.* at 1–2; ECF No. 50 at 1.

On June 16, 2026, the Court granted Defendant's Consent Motion for Leave to Supplement the Administrative Record, with information concerning control over the Proofpoint email server at issue in this action. ECF No. 52 (Consent Motion); Minute Order, dated June 16, 2026. On June 18, 2026, Defendant submitted the corrected AR. ECF No. 55.

On June 26, 2026, Plaintiff filed its Reply in support of its MJAR and Response to Defendant and CEC's MJARs. ECF No. 60 (Pl. Reply). On July 8, 2026, Defendant and CEC filed their Replies in support of their respective MJARs. ECF Nos. 61 (CEC Reply), 64 (Def. Reply).

On August 4, 2026, the Court held oral argument on the parties' MJARs. *See* Minute Entry, dated Aug. 4, 2026. The MJARs are now fully briefed and ripe for review.

## APPLICABLE LEGAL STANDARDS

The Tucker Act, 28 U.S.C. § 1491(b)(1), as amended by the Administrative Dispute Resolution Act of 1996, affords this Court with jurisdiction over bid protests. The Court analyzes the procurement under the Administrative Procedure Act's (APA) standards to determine whether the Agency "acted without rational basis or contrary to law when evaluating the bids and awarding the contract." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005); 28 U.S.C. § 1491(b)(4); *see Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1374 (Fed. Cir. 2024). The Court reviews the procurement under the standards set forth in the APA. 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 766 (Fed. Cir. 2021). The APA requires a reviewing court to

determine whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974). Thus, to prevail in a post-award bid protest, a plaintiff must demonstrate that "(1) 'the procurement official's decision lacked a rational basis' or (2) 'the procurement procedure involved a violation of regulation or procedure.'" *DynCorp Int'l v. United States*, 10 F.4th 1300, 1308 (Fed. Cir. 2021) (*DynCorp I*) (quoting *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020)).

When a bidder alleges that the procurement official's decision lacked a rational basis, the Court reviews "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018) (quoting *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1351 (Fed. Cir. 2004)). As the United States Court of Appeals for the Federal Circuit (Federal Circuit) has explained, "the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001)); *see also Impresa*, 238 F.3d at 1333 (noting a similarly high burden for claims of a violation of regulation or procedure, which must involve "a clear . . . violation of applicable statutes or regulations" (quoting *Kentron Hawaii, Ltd v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973))). Consistent with this heavy burden, agency decisions are "entitled to a presumption of regularity." *Impresa*, 238 F.3d at 1338 (citing *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626–27 (1986)). The Court's "role in reviewing procurement decisions . . . is not to evaluate the offerors' proposals anew or to substitute [its] judgment for that of the agency." *Harmonia Holdings Grp., LLC v. United States*, 999 F.3d 1397, 1408 (Fed. Cir. 2021); *see also Honeywell, Inc. v. United States*,

870 F.2d 644, 648 (Fed. Cir. 1989) ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.") (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). Rather, courts "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp.*, 419 U.S. at 286. Indeed, "[a]lthough the inquiry under the APA 'is to be searching and careful, . . . [t]he court is not empowered to substitute its judgment for that of the agency.'" *Insight Pub. Sector, Inc. v. United States*, 161 Fed. Cl. 760, 786 (2022) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416–20 (1971)). The decision lacks a rational basis when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or . . . is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). When a disappointed bidder alleges a violation of a regulation or procedure, the Court reviews whether there was "a clear and prejudicial violation of applicable statutes or regulations." *Impresa*, 238 F.3d at 1333 (quoting *Kentron*, 480 F.2d at 1169.).

Where the Court finds that an agency decision lacked a rational basis, the Court must also evaluate the factual question of prejudice. *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021); *WellPoint Mil. Care*, 953 F.3d at 1377. A protestor establishes prejudice by showing "that there was a 'substantial chance' it would have received the contract award but for" that error. *Sys. Stud. & Simulation*, 22 F.4th at 998 (quoting *Bannum*, 404 F.3d at 1353). A protestor cannot prevail if it does not establish prejudice. *DynCorp I*, 10 F.4th at 1308 ("[T]o

prevail in a bid protest, a protestor must show a significant, prejudicial error in the procurement process." (quoting *WellPoint Mil. Car*, 953 F.3d at 1377)); *DevTech Sys., Inc. v. United States*, 176 Fed. Cl. 297, 313 (2025).

In the Court of Federal Claims, bid protests are adjudicated under Rule 52.1(c), which provides an expedited trial on a "paper record, allowing fact-finding by the trial court." *Bannum*, 404 F.3d at 1356 (referencing Rule 56.1, which was replaced by Rule 52.1(c)); *see* Rule 52.1(c). Unlike at summary judgment, genuine disputes of material fact do not preclude a court from granting a motion for judgment on the administrative record. *Bannum*, 404 F.3d at 1357. This Court is also empowered to provide any relief, including declaratory or injunctive relief, that it deems proper. 28 U.S.C. § 1491(b)(2); *Oak Grove*, 116 F.4th at 1375. "[T]he Court of Federal Claims has broad equitable powers to fashion an appropriate remedy" in bid protest cases. *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011). To that end, this Court may remand the procurement decision back to an agency for further factual findings or reconsideration according to the Court's directions. *See* Rule 52.2; 28 U.S.C. § 1491(a)(2) ("In any case within its jurisdiction, the [Court of Federal Claims] shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just."); *see GovCIO, LLC v. United States*, 177 Fed. Cl. 579, 596 (2025).

## <u>DISCUSSION</u>

Plaintiff asserts that it has identified several errors in DEA's evaluation and subsequent award to CEC that should justify overturning the award. Pl. MJAR at 6–9. Defendant and Intervenor argue, to the contrary, that Plaintiff has not identified any prejudicial errors in the evaluation and award, so that the Court should not disturb the award to CEC. Def. MJAR at 9; CEC MJAR at 9.

*First*, Plaintiff raises several arguments concerning CEC's June 4 clarifications email. Pl. MJAR at 6–7. FYI contends that (i) the DEA could not have sought clarifications at all with CEC to correct the error in CEC's bid, and (ii) it was improper for the DEA to seek clarifications from CEC but not FYI. *Id.* at 7. FYI additionally argues that the late-is-late rule applied a strict timeliness requirement to the CO's receipt of a modified bid, and that CEC's email's lengthy journey through DOJ's security software made the email late. *Id.* at 6–7. A violation of the late-is-late rule would lead to the disqualification of CEC's bid, Plaintiff asserts. *Id.* Defendant and CEC contend, and the Court agrees, that DEA did not violate any fairness rules when it solicited the clarification. Def. MJAR at 19–27; CEC MJAR at 40–54. However, FYI is correct that the late-is-late rule squarely applied to CEC's June 4 email because the correction to CEC's quote contained within the email qualified as a modification under the FAR. Pl. MJAR at 7. As explained further below, DEA's consideration of CEC's June 4 email violated the late-is-late rule, and this violation constitutes prejudicial error.

*Second*, FYI argues that it has identified three errors in DEA's evaluation of non-price factors: one error for each non-price factor that the agency evaluated. Pl. MJAR at 7–9. Although Plaintiff prevails on the merits based on the violation of the late-is-late rule alone, the Court assesses the other issues raised in the MJARs for completeness. Plaintiff disputes the strengths assigned to CEC and the lack of strengths assessed for its own offer. *See id.* at 25–41. Defendant and CEC argue, and the Court agrees, that DEA's evaluation of non-price factors was rational and properly documented. Def. MJAR at 27–43; CEC MJAR at 18–36.

*Third*, FYI argues that DEA irrationally determined that CEC's more expensive proposal offered the best value and that DEA insufficiently explained the tradeoff between price and technical quality that led to the award decision. Pl. MJAR at 40. Defendant and CEC argue, and

the Court agrees, that DEA properly explained that, in DEA's discretion, CEC offered advantages that outweighed the less-than-one-percent price disparity. Def. MJAR at 43–46; CEC MJAR at 36–40.

*Finally*, the Court addresses injunctive relief. As Plaintiff demonstrates success on the merits based on the violation of the late-is-late rule alone, the Court enjoins the DEA from proceeding with its award to CEC under the present Request for Quotation to the extent the award is based on DEA's unlawful consideration of CEC's late-received, modified quotation. The DEA retains discretion to determine how it will otherwise proceed, if at all, with its procurement of Human Capital Support Services.

## I. CEC's Clarifications Email

### A. <u>DEA's Choice to Request Clarifications from CEC but Not FYI</u>

FYI asserts that DEA purportedly held discussions with CEC and thus "had to conduct discussions with all offerors." Pl. MJAR at 25. Defendant counters that the requirement to conduct discussions with all offerors does not apply to this Subpart 8.4 procurement, which is instead governed by a requirement that "DEA treat[] all offerors fairly and impartially." Def. MJAR at 24.

The FAR Part 15 requirement to hold discussions equally with all offerors does not apply to this Subpart 8.4 procurement, and the RFQ does not incorporate FAR 15.306. *See* Tabs 10, 11. FAR Part 15 requirements (such as the discussions requirements in FAR 15.306(d)) do not apply in Subpart 8.4 procurements unless they are specifically incorporated into the procurement. FAR 8.404(a); *see Integrated Fin. & Acct. Sols., LLC v. United States*, 161 Fed. Cl. 475, 491 (2022); *Unisys Corp. v. United States*, 89 Fed. Cl. 126, 140 (2009). Plaintiff does not cite any precedent

or section of the RFQ[6] that would require DEA to communicate equally with all quoters. *See* Pl. MJAR at 22–25. Instead, in a FAR Subpart 8.4 procurement, all communications between the agency and quoters must reflect fairness, as the FAR requires for all procurement activities. *Advantaged Sols., Inc. v. United States*, 179 Fed. Cl. 801, 814 (2026) (upholding unequal discussions because agency "acted reasonably and fairly"); *Unisys*, 89 Fed. Cl. at 140 (applying "requirement of fundamental fairness"). Indeed, the FAR requires that "[a]ll contractors and prospective contractors shall be treated fairly and impartially *but need not be treated the same*." FAR 1.102-2(c)(3) (emphasis added).

FYI complains that if CEC had the chance to correct a minor typographical error in its quote, FYI also deserved a chance to communicate with DEA about "supposed past performance issues with FYI's incumbent performance." Pl. MJAR at 25. FYI argues that if it had the chance to hear about past performance concerns, it could have substantively modified its proposal "by providing a copy of the incumbent CPAR the evaluators claimed was missing" or by lowering its quoted price. *Id.* In *Unisys*, which also involved a Subpart 8.4 procurement, communications with the eventual awardee were deemed fair because they "simply allowed [the agency] to confirm" aspects of the offeror's proposal and did not allow an offeror to make material changes to its proposal. *Unisys*, 89 Fed. Cl. at 141. It was fair that the disappointed offeror did not receive a

---

[6] Plaintiff argues that the incorporation of FAR 52.212-1(g) in the RFQ "imports traditional discussions standards"; however, Plaintiff does not identify any specific language in the provision that would import discussions standards. Pl. MJAR at 22. FAR 52.212-1(g) states that "[t]he Government intends to evaluate offers and award a contract without discussions with offerors," and that "the Government reserves the right to conduct discussions if later determined by the Contracting Officer to be necessary." FAR 52.212-1(g). Such language does not invoke the FAR Part 15 discussion requirements or a requirement that discussions be held with all offerors. *See Unisys*, 89 Fed. Cl. at 139 (finding that RFQ statement that agency "may make award based on initial offers received, without discussion of such offers" did not incorporate FAR Part 15 discussion standards into Subpart 8.4 procurement).

chance to substantively amend its proposal because the agency's "award decision was based on both [offerors'] *initial* prices and technical proposals." *Id.* (emphasis in original). Similarly, here DEA's clarification simply allowed CEC to correct typographical errors in the quote for mandated labor hours in one CLIN and for one price field where the multiplication was facially incorrect, without making any substantial changes, and FYI had not made equivalent typographical errors that could be corrected without substantively changing its quote. *See* Tab 14b, AR 367, 548, Tab 14c, AR 704–05. As DEA ultimately made its decision based on the information that CEC and FYI had each originally intended to submit to DEA, the complained of communications with CEC about correcting the typo were not unfair. *See Unisys*, 89 Fed. Cl. at 141. DEA acted "reasonably and fairly" when it requested CEC correct a minor typographical error but did not provide FYI with a chance to make substantive changes to its proposal. *Advantaged Sols.*, 179 Fed. Cl. at 814.

### B. Clarifications or Discussions

Additionally, even if the equal discussion requirement of FAR 15.306 applied, DEA still would not have violated that requirement. It is evident that DEA engaged in clarifications with CEC, not discussions. An agency that engages in clarifications, unlike discussions, need not engage equally with each offeror. *Compare* FAR 15.306(a) (containing no requirement that agencies conduct clarifications with all offerors), *with* FAR 15.306(d)(3) (requiring that discussions be conducted with "each offeror still being considered for award"); *see ENGlobal Gov't Servs., Inc. v. United States*, 159 Fed. Cl. 744, 765 (2022) ("[U]nlike discussions, the government is permitted to engage in clarifications with fewer than all offerors."). Thus, even if required to engage equally in discussions, DEA would not have violated that requirement.

FYI contends that DEA engaged in discussions with CEC because DEA "allowed CEC to revise multiple parts of its quote." Pl. MJAR at 24. Defendant argues, to the contrary, that "the

communications at issue here were **clarifications**, not discussions." Def. MJAR at 25 (emphasis added). CEC similarly asserts that "the exchange between DEA and CEC concerning CEC's corrected quotation constituted **clarifications**, not discussions." CEC MJAR at 48 (emphasis added).

It is well established that "[c]larifications are limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated." FAR 15.306(a)(1). In contrast, the FAR also creates a category of exchanges before award called "[d]iscussions," which "are tailored to each offeror's proposal, and must be conducted by the contracting officer with each offeror within the competitive range." FAR 15.306(d)(1). "[T]he term 'discussions' has a specific legal definition: 'discussions involve negotiations' and 'are undertaken with the intent of allowing the offeror to revise its proposal.'" *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1332 (Fed. Cir. 2004) (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1321 (Fed. Cir. 2003)). "[T]he 'acid test for deciding whether discussions have been held is whether it can be said that an offeror was provided the opportunity to revise or modify its proposal.'" *Insight Pub. Sector*, 161 Fed. Cl. at 803 (quoting *Davis Boat Works, Inc. v. United States*, 111 Fed. Cl. 342, 353–54 (2013)).

"Clarifications are not to be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, or otherwise revise the proposal." *Dell Fed. Sys.*, 906 F.3d at 998 (quoting *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 661 (2002)); *see Kropp Holdings, Inc. v. United States*, 176 Fed. Cl. 512, 540 (2025) ("Any exchanges that cure, or attempt to cure, a material error are considered discussions under the FAR."). However, clarifications are allowed to correct a cost calculation error in a proposal when "the existence of the mistake and the amount intended by the offeror [are] clear from the face of the

proposal." *DynCorp Int'l LLC v. United States*, 76 Fed. Cl. 528, 545 (2007) (*DynCorp II*) (quoting *IPlus, Inc.*, B298020, et al., 2006 CPD ¶ 90 (Comp. Gen. June 5, 2006)). "Importantly, the agency's characterization of its communications with a bidder, as 'discussions' or 'clarifications,' is entitled to deference." *Insight Pub. Sector*, 161 Fed. Cl. at 803 (citing *Info. Tech.*, 316 F.3d at 1323).

Here, CEC engaged in clarifications with DEA, rather than discussions, as CEC never had "the opportunity to revise" its quotation. *See Insight Pub. Sector*, 161 Fed. Cl. at 803. Instead, the record reveals that "the existence of the mistake and the amount intended by the offeror [are] clear from the face of the proposal." *DynCorp II*, 76 Fed. Cl. at 545 (quoting *IPlus, Inc.*, B-298020, et al., 2006 CPD ¶ 90 (Comp. Gen. June 5, 2006)). CEC makes two different calculation errors for the same line item, CLIN 0005, in its original quotation. *See* Tab 14b, AR 367, 548. First, CEC's schedule of supplies reflects that CEC proposed to provide 7,680 hours of labor (the RFQ's requisite amount) in CLIN 0005 at a rate of $[redacted] per hour, for a total of $[redacted]. Tab 14b, AR 367. However, the multiplication here is obviously incorrect, as multiplying the hours by the quoted rate should have led to a product of $[redacted]. *See id.* Later, in the basis of estimates within the quotation, CEC stated that, for CLIN 0005, it would provide 5,760 hours at a rate of $[redacted] per hour, or a total of $[redacted]. Tab 14b, AR 548. The multiplication is correct, but the proposed number of hours does not align with the schedule of supplies in the RFQ, which requires each quoter to propose 7,680 hours for CLIN 0005. Tab 11, AR 246. Although each mention of CLIN 0005 in CEC's original quote included an unexplained mathematical or typographical error, CEC's proposed rate was the same: $[redacted] per hour. Tab 14b, AR 367, 548. This proposed rate remained the same in the corresponding parts of CEC's post-clarifications quotation: $[redacted]. Tab 14c, AR 708, 716. The correction of the hours provided and the

multiplication error did not constitute a substantive revision to the quotation because only CEC's proposed unit price contributed to the CO's analysis and best value tradeoff analysis, and the quoted unit price remained static and did not change. *See* Tab 24, AR 1185. As CEC never received an opportunity to "materially alter the technical or cost elements of the proposal," DEA engaged in clarifications, not discussion. *See Dell Fed. Sys.*, 906 F.3d 998.

Minor clerical errors that are apparent on the face of an offer, such as the error in CEC's proposal, can be corrected through clarifications. *See Aspire Therapy Servs. & Consultants, Inc. v. United States*, 166 Fed. Cl. 366, 377–78 (2023). In *Aspire Therapy*, an error in the number of labor hours proposed was a minor clerical error when the error "should have been evident" because an offeror typed "2,336" when it should have typed "2,366." *Id.* at 378. This was an obvious typographical error because the numbers "are off by one digit and appear so similar that the error is easily overlooked by the naked eye." *Id.* Similarly, here, CEC made obvious typographical errors concerning the number of labor hours. In its original basis of estimates, CEC proposed 5,760 hours for CLIN 0005, when it should have proposed 7,680. *See* Tab 14b, AR 548. However, the next line on the table (CLIN 0006) correctly includes 5,760 as the number of hours proposed. *Id.* This difference—transposing the number of hours from CLIN 0006 to one line higher on CLIN 0005, rather than using the figure the RFQ mandated—is a minor clerical error because, like the misplaced digit in *Aspire Therapy*, the lines on the chart "appear so similar that the error is easily overlooked by the naked eye." *Aspire Therapy*, 166 Fed. Cl. at 378; *see also Galen Med. Assocs.*, 369 F.3d at 1333 (Submission was a clarification if it "was in the nature of a correction of an obvious mathematical error."). Similarly, the multiplication error was "clear from the face of the proposal." *DynCorp II*, 76 Fed. Cl. at 545. As such, CEC's proposal could be corrected through clarifications, rather than discussions.

**C. Violation of the Late-is-Late Rule**

*1. Applicability of the Late-is-Late Rule to CEC's Modification*

FYI contends that CEC's clarification email arrived late in the CO's inbox and should not have been considered in the competition because such consideration violates the late-is-late rule. Pl. MJAR at 17. The late-is-late rule applies a strict timeliness requirement based on the time that certain communications are "received at the Government office," rather than when communications are sent. FAR 52.212-1(f)(2)(i). In the present procurement, the Rule itself was expressly incorporated into the RFQ. Tab 11, AR 276, 317. FYI argues that CEC's June 4 email to DEA qualifies as a revision or modification, so that the late-is-late rule applies as a matter of law. Pl. Reply at 9. Defendant and CEC counter that the late-is-late rule purportedly does not apply to clarifications, so that the CO was not required to disqualify CEC's quote. Def. MJAR at 20; CEC MJAR at 44.

As is the situation here, a late-is-late rule incorporated into an RFQ creates strict timing deadlines for "[a]ny offer, modification, revision, or withdrawal of an offer." FAR 52.212-1(f)(2)(i); *see* Tab 11, AR 276, 317 (incorporating FAR 52.212-1 into RFQ). A communication that falls into any of those four categories that is "received at the Government office designated in the solicitation after the exact time specified for receipt of offers is 'late.'" *Id.* As the relevant deadline is the time of receipt, a timely-sent email might still be late under the rule if technical problems in the agency's email system cause a late arrival to the CO's inbox. *See eSimplicity, Inc. v. United States*, 162 Fed. Cl. 372, 381 (2022) (affirming that late-is-late rule applies to timely-sent email delayed by government's technical problems and considering exceptions to late-is-late rule). A late submission can only be considered if several requirements are met, including a

requirement that the CO "determines that accepting the late offer would not unduly delay the acquisition." FAR 52.212-1(f)(2)(i).

As explained below, in addition to being a clarification, CEC's email constitutes a modification to its quote, and accordingly the late-is-late rule applies here. The Court interprets FAR clauses, like other federal regulations, according to typical statutory interpretation methods. *See Barry v. McDonough*, 101 F.4th 1348, 1352 (Fed. Cir. 2024) ("When interpreting a regulatory provision, we apply the rules of statutory construction."); *Goodman v. Shulkin*, 870 F.3d 1383, 1386 (Fed. Cir. 2017); *Rick Aviation*, *Inc. v. United States*, 182 Fed. Cl. 53, 65–66 (2026) (applying "rules of statutory construction" to interpret FAR 52.212-1(f)). The FAR defines each of the four types of communications named in the late-is-late rule. *See* FAR 52.212-1(f)(2)(i). The relevant meaning here for a "modification" is the definition of a "[p]roposal modification" set forth in FAR Part 15,[7] which is one of at least three meanings of "modification" in the FAR. *See* FAR 15.001; *see also* FAR 2.101 (defining physical "[m]odifications" that may be made to a commercial product); FAR Part 43 (regulating "contract modifications," which change contract terms during

[7] The procurement at issue was conducted under FAR Subpart 8.4, and the version of the late-is-late rule incorporated in the RFQ is written for commercial procurements conducted under Part 12. *See* Tab 24, AR 1173 (specifying use of Subpart 8.4); FAR 12.301(b)(1) (prescribing use of FAR 52.212-1). However, the Court finds that the definitions in Part 15 are instructive for the interpretation of the rule. Parts 8 and 12 do not define "modification," "revision," or "clarification." *See* FAR Parts 8, 12. Further, each party to this case cites Part 15 to define at least one of these terms. *See* Pl. MJAR at 21; Def. MJAR at 20; CEC MJAR at 44. Additionally, the Federal Circuit has referenced other Parts of the FAR (besides Part 12) to interpret FAR 52.212-1. *See Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1347 (Fed. Cir. 2021) (relying upon examples in FAR Part 14 to interpret terms in FAR 52.212-1(g)). In addition, the Part 15 definitions of "clarifications" and "discussions" may inform whether an agency has complied with fundamental fairness principles that apply under Subpart 8.4. *See Centerra Grp., LLC v. United States*, 138 Fed. Cl. 407, 413–14 (2018). The Court further notes that in addition to its citations to Part 15, and despite extensive briefing and argument, no party has argued that the above-referenced FAR Part 15 definitions are inapplicable here.

performance). A "[p]roposal modification is a change made to a proposal before the solicitation closing date and time, or made in response to an amendment, or made to correct a mistake at any time before award." FAR 15.001. Any such "modification" triggers the late-is-late rule. FAR 52.212-1(f)(2)(i).

CEC's June 4 email containing the corrected quotation information is a "modification" of its proposal because it was "a change . . . made to correct a mistake at any time before award." FAR 15.001.[8] Under the FAR, mistakes include "[a]pparent clerical mistakes." FAR 14.407-2.[9] The FAR provides examples of clerical mistakes that include typographical errors in the numbers included in an offer, such as the "[o]bvious misplacement of a decimal point" and an "[o]bvious mistake in designation of unit." *Id.* Here, the Court finds, as a matter of fact, that CEC made a clerical mistake in its proposal because it appears to have failed to multiply numbers correctly on one page and transposed two cells in a spreadsheet on another page. *See* Tab 14b, AR 367, 548. Indeed, Defendant and CEC each describe the mistake in CEC's original quote as a "clerical error." Def. Reply at 14 ("It is obvious from the face of the proposal that there was a clerical error."); CEC Reply at 9 ("obvious clerical error/miscalculation"). The parties have not presented any authority that would distinguish this "clerical error" from the "[a]pparent clerical mistakes" set forth in FAR 14.407-2. *See* Def. Reply at 14; CEC Reply at 9. CEC's email was a "change . . . made to correct" CEC's mistakes. FAR 15.001. The CO herself referenced CEC's

---

[8] Even if the FAR 15.001 definition did not apply, the plain meaning of "modification" includes small changes made to something, such as the changes made to CEC's proposal. *See Modification*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/modification ("the making of a limited change in something").

[9] FAR Part 15 references FAR 14.407 to define "mistakes," so the examples in FAR 14.407-1 are relevant to the use of the word "mistake" in FAR 15.001. *See* FAR 15.306(b)(3)(i) (referencing FAR 14.407 to define "mistakes").

June 4 email as "providing corrections" to CEC's "calculation discrepancies." Tab 24, AR 1176. As such, the email from CEC to DEA constitutes a "modification" to which the late-is-late rule plainly applies. *See* FAR 52.212-1(f)(2)(i).

Defendant and CEC argue that the late-is-late rule does not apply because the late-is-late rule does not expressly use the term "clarification." *See* Def. MJAR at 20; CEC MJAR at 44. However, neither party establishes that a clarification email cannot also qualify as a modification under the FAR. *See* Def. Reply at 8–9; CEC MJAR at 45. CEC contends that its email "was only a clarification correcting a minor clerical error." CEC MJAR at 45. As discussed above, a modification is "a change . . . made to correct a mistake," including a clerical mistake, so under the FAR the clarification clearly was also a modification. *See* FAR 15.001; *supra* at n.8 (similar dictionary definition). Defendant cites *Klinge Corp. v. United States*, 83 Fed. Cl. 773, 779 (2008), for a purported distinction between clarifications and modifications. Def. Reply at 8–9. To the extent that *Klinge* is persuasive, it supports the argument that CEC's clarifications constituted modifications. *See Klinge*, 83 Fed. Cl. at 778. *Klinge* distinguishes between a revision and a clarification—the decision never states that a modification cannot also be a clarification. *See id.* at 779. Separately, *Klinge* distinguishes between "modifications" and "explanations." *Id.* There, the "explanation" at issue did not change the offer to the agency but instead was a supplemental piece of information to clarify an "ambiguity" in the offer. *Id.* at 778–79. The *Klinge* decision held that the "explanation" was a "clarification" and not a "modification" because that particular clarification did not modify the offer, but it does not state that a clarification can never be a modification. *See id.* at 779–80. In contrast, CEC's clarification here changed its quote through the correction of obvious clerical errors, changing it so the clarification was more than just an explanation. *Compare* Tab 14b, AR 367, 548 (each quoting price of $[redacted] for CLIN 0005),

*with* Tab 14c, AR 708, 716 (each quoting price of $[redacted] for CLIN 0005). Thus, under the logic of *Klinge*, CEC's change would also qualify as a modification. *See Klinge*, 83 Fed. Cl. at 778.

Defendant additionally fails to support its argument that a clarification cannot also be a modification. Def. Reply at 8. Although not all clarifications are modifications, an email from an offeror to an agency can constitute both a clarification and a modification. "Clarifications are limited exchanges," which include explanations of material within the proposal and "certain changes" to proposals themselves. FAR 15.306(a)(1); *Galen Med. Assocs.*, 369 F.3d at 1333. Clarifications may be used to "resolve minor or clerical errors." FAR 15.306(a)(2). The Court of Federal Claims has routinely held that the use of clarifications includes "correcting mistakes." *WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 270 (2021); *see, e.g., ENGlobal Gov't Servs.*, 159 Fed. Cl. at 765; *Aspire Therapy*, 166 Fed. Cl. at 378. Indeed, "a change made to a proposal . . . made to correct a mistake at any time before award" is also a proposal modification. FAR 15.001. Thus, the correction of a mistake in a proposal made in response to an agency's request for clarification, before award of a contract, is both a clarification and a modification. *See* FAR 15.001; FAR 15.306. Defendant's argument improperly collapses the term "modification" to have the same meaning as "revision"[10] within the late-is-late rule, which ignores the "canon . . . whereby different terms are presumed to have different meanings." *States Roofing Corp. v. Winter*, 587 F.3d 1364, 1370 (Fed. Cir. 2009); *see also NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous."). As

---

[10] A revision is specifically a communication from the offeror to the agency that follows discussions and negotiations in a FAR Part 15 procurement, which can "clarify and document understandings reached during negotiations." FAR 15.307(b).

such, the finding that the DEA and CEC engaged in clarifications does not preclude the finding that CEC's June 4 email was a modification.

Finally, Defendant argues that the CO's emailed instructions supersede the RFQ's incorporation of the late-is-late rule. Def. MJAR at 20. In her email to CEC soliciting clarifications, the CO email instructs CEC to "reply to this email . . . no later than 1:30PM, ET, today, June 4, 2025." Tab 14c, AR 704. This email seems to set a deadline based on action by CEC ("reply to this email"), rather than one based on the time that the CO receives the email. *See id.* Defendant asserts that the late-is-late rule "does not apply to deadlines outside of the solicitation like the one at issue here." Def. MJAR at 20. None of the parties cite precedent regarding a CO's ability to supersede the late-is-late rule, expressly incorporated into an RFQ, through an email requesting clarifications. *See* Pl. Reply at 10; Def. MJAR at 20.

Defendant's argument fails; the late-is-late rule's determination of lateness based on the time that "an offer [is] received" still squarely applies to an email containing a "modification." FAR 52.212-1(f)(2)(i). In *Competitive Innovations*, the agency instructed an offeror via a "communications letter" to submit a revised quote by 10:00 a.m. on a particular date. *Competitive Innovations, LLC v. United States*, 177 Fed. Cl. 717, 723 (2025). The offeror sent the revised quote at 12:48 p.m., more than two hours after the deadline. *Id.* The Court of Federal Claims held that the solicitation at issue incorporated the same version of the late-is-late rule, from FAR 52.212-1, that is at issue in this case. *Id.* at 726. As the solicitation incorporated the late-is-late rule, in *Competitive Innovations* the late-is-late rule's strict requirements applied to the response to the communications letter since the late-is-late rule applies to "any modifications." *Id.* at 726 (quoting FAR 52.212-1(f)). The letter from the agency to the offeror supplied "the 10:00 AM deadline" for the offeror to submit its modification, but the late-is-late rule determined the

consequences of lateness. *Id.* Though not binding, *Competitive Innovations* is persuasive. In this case, the late-is-late rule incorporated into the RFQ similarly applies to "[a]ny modification." FAR 52.212-1(f)(2)(i); *see also* Tab 11, AR 276, 317 (incorporating FAR 52.212-1). During the competition covered by this strict rule, the CO set a clearly specified deadline: CEC had to reply "not later than 1:30PM ET . . . in order for [its] quote to be considered." Tab 14c, AR 704. Under the approach set forth in *Competitive Innovations*, CEC's response to the CO's email was subject to the deadline specified in the CO's email (1:30 p.m.) and the late-is-late rule's submission requirements and strict lateness constricts. *See Competitive Innovations*, 177 Fed. Cl. at 726; Tab 11, AR 276, 317, Tab 14c, AR 704.

Further, permitting the CO's email seeking clarifications to supersede the late-is-late rule's incorporation in the RFQ would violate the well-established rule that "[o]nce an agency places requirements in the solicitation, the agency must 'either follow them or amend the [solicitation] to eliminate them." *Kropp Holdings*, 176 Fed. Cl. at 530 (quoting *CW Gov't Travel, Inc. v. United States*, 154 Fed. Cl. 721, 732 (2021)). In *Kropp Holdings*, this rule applied and meant that the CO could not change the standard set forth in the solicitation for determining when a proposal was late-received.[11] *Id.* at 531–32. In that case, "the RFP clearly state[d] that the 'submission inbox' time stamp controls for purposes of assessing timeliness of offers." *Id.* at 531. The CO determined that an email was timely received based on the time of another time stamp—the time of the email's first contact with a government server—even though the email was received late according to the submission inbox time stamp. *Id.* at 531–32. This impromptu change to the method of determining

[11] A CO's emailed instructions for clarifications can set requirements determining lateness when a solicitation does not incorporate the late-is-late rule or any other rule that determines lateness. *See Insight Pub. Sector*, 161 Fed. Cl. at 806 & n.25.

an email's timeliness violated the terms of the RFP because it was "a significantly different basis in evaluating the proposals than was disclosed [in the RFP]." *Id.* at 532 (quoting *G4S Secure Integration LLC v. United States*, 161 Fed. Cl. 387, 410 (2022)). Applied here, the same standard means that the CO did not have the power to change the terms of the RFQ, which considered a proposal timely or late based on the time it was "received." *See id.*; FAR 52.212-1(f)(2)(i); Tab 11, AR 276 (incorporating FAR 52.212-1 into RFQ). As such, the late-is-late rule applies to CEC's June 4 response to the clarifications email.

*2. Violation of the Late-is-Late Rule*

FYI argues that DEA's consideration of CEC's modification violates the late-is-late rule "under a straightforward application" of the rule. Pl. MJAR at 20. Defendant disagrees and argues that the "relevant delivery location" is not the CO's inbox, but instead the DOJ Proofpoint server, making the email submission timely. Def. Reply at 10. CEC similarly argues that there was no violation of the late-is-late rule because the Proofpoint server "received" its email before the 1:30 p.m. deadline. CEC Reply at 5.

The Court turns to the statutory text to resolve the dispute and accordingly holds that DEA could not consider CEC's June 4 modification because it was "received at the Government office designated in the solicitation after the exact time specified." FAR 52.212-1(f)(2)(i). The relevant "Government office" was the CO's inbox because the RFQ specified her email address as the "LOCATION" for quote submission. Tab 11, AR 282; *see* Tab 14c, AR 704.[12] The CO's email

[12] The CO's clarifications email departs from the RFQ in its definition of the relevant inbox. *Compare* Tab 11, AR 282*, with* Tab 14c, AR 704. The RFQ instructs quoters to submit quotes to the CO's email "and" another DEA employee's email inbox. Tab 11, AR 282. The CO's clarifications email, in contrast, only requires a "reply" to her own email inbox. Tab 14c, AR 704. Plaintiff does not contend, however, that CEC must have also sent its modification to the other DEA employee's email inbox specified in the RFQ, and the Court need not resolve the issue to

requesting clarifications from CEC specified "not later than 1:30PM, ET" as the time by which the reply must be received in her inbox on June 4. Tab 14c, AR 704. The record reveals that CEC's email was received in the CO's inbox at "1:44:30 PM," which is later than 1:30 p.m. *See* Tab 14c, AR 705. The Court has allowed Defendant to supplement the record with evidence explaining why CEC's email arrived in the CO's inbox after the 1:30 p.m. deadline. *See* ECF No. 47 at 1. That evidence reflects that CEC's "email reached [the CO's] inbox at 1:44pm." Tab 55b, AR 2581.[13] As CEC's "modification" was "received at the Government office designated in the solicitation after the exact time specified," the modification was late. FAR 52.212-1(f)(2)(i). Accordingly, DEA unlawfully considered the modified proposal that CEC submitted when making its award decision. Tab 19, AR 1152 (Business Evaluation Committee's consideration of CEC's post-modifications total price), Tab 24, AR 1176 (CO's consideration of "corrections"). In sum, DEA is bound to the rule that the late modifications should "not be considered," and DEA's consideration of the modification when making its award decision here violated the FAR's late-is-late rule. *See* FAR 52.212-1(f)(2)(i).

At oral argument, Defendant asserted that CEC's email's arrival in the Proofpoint security filter (before the 1:30 p.m. deadline) could satisfy the late-is-late rule, in which case the Proofpoint security filter would qualify as the "Government office designated in the solicitation." OA Tr. at 66:3–7; FAR 52.212-1(f)(2)(i). To the contrary, as other judges the Court of Federal Claims have

decide this case. *See* Pl. MJAR at 18.

[13] Defendant also submitted an affidavit from a DOJ official stating that while CEC's email was stuck in Proofpoint, CEC's "mail servers automatically attempted to re-send," the first of which was the email containing CEC's modified quotation. Tab 56, AR 2584–85. Logs included in the affidavit demonstrate that the re-sent email that passed through Proofpoint did pass through the Proofpoint server until 1:43:52 p.m., after the 1:30 p.m. deadline. Tab 14c, AR 704 (setting 1:30 p.m. deadline), Tab 56, AR 2585 (email passed Proofpoint server at 1:43:52 p.m.).

held, the "Government office" at issue in the late-is-late rule is the specific email inbox named in the solicitation or RFQ, not an agency email server more broadly, and that an email must reach the prescribed inbox by the deadline to be timely. *See, e.g., Rick Aviation*, 182 Fed. Cl. at 67; *Watterson Constr. Co. v. United States*, 98 Fed. Cl. 84, 93 (2011).[14] The language of the late-is-late rule compels this result. *See* FAR 52.212-1(f)(2)(i). When different terms appear "in the alternative in the same statutory provision, it is reasonable to assume that the words have different meanings." *Walton v. United States*, 551 F.3d 1367, 1370 (Fed. Cir. 2009). The late-is-late rule uses the term "Government office" alongside the term "initial point of entry to the Government infrastructure." *See* FAR 52.212-1(f)(2)(i). Thus, "Government office" and "initial point of entry to the Government infrastructure" have different meanings. *See Walton*, 551 F.3d at 1370. In this situation, the Proofpoint server is the "initial point of entry to the Government infrastructure" because it is the first government server that CEC's email reached. Tab 56, AR 2586. In contrast, only the email addresses of the CO and another DEA official can qualify as a "Government office designated in the solicitation," because those are the only locations for submission mentioned in the RFQ. *See* Tab 11, AR 282. The RFQ never mentions Proofpoint, so the Proofpoint server is not "designated in the solicitation." *See* Tab 11, AR 222–347; FAR 52.212-1(f)(2)(i). Instead, the RFQ designated the CO's email inbox as the Government office where offers must be received. Tab 11, AR 282 (designating the CO's email address as the "LOCATION" for quote submissions).

[14] Defendant cites *Watterson* for the proposition that "the Government's email servers," rather than the particular CO's email address listed in a solicitation, qualify as the "Government office designated in the Solicitation." Def. MJAR at 30–31 (citing *Watterson*, 98 Fed. Cl. at 93). Defendant misreads *Watterson*, in which another judge of the Court of Federal Claims "determined that the 'Government office designated in the solicitation,' . . . was the CO's email address." *Watterson*, 98 Fed. Cl. at 93.

The term "Government office designated in the solicitation" must have an independent meaning; here the term clearly references the CO's email inbox that is specified in the RFQ. *See Walton*, 551 F.3d at 1370; Tab 11, AR 282.

*3. The Government Control Exception is Inapplicable*

There is a notable exception to the late-is-late rule called the "government control exception," which allows a CO to excuse a late-received modification if "[t]here is acceptable evidence to establish that it was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers," and other requirements are met. *See* FAR 52.212-1(f)(2)(i)(B); *see also eSimplicity*, 162 Fed. Cl. at 381–86 (discussing government control exception's application to emails). However, at oral argument and in its briefs, Defendant disclaimed the exception, clearly and unequivocally stating that it does not seek to invoke the government control exception to the late-is-late rule. OA Tr. at 65:20–22 ("[W]e aren't arguing that the 'government control' exception is met here."); *see also* Def. Reply at 8 ("The Court need not weigh in on questions about . . . Government control."). Although CEC argued in its MJAR that the government control exception to the late-is-late rule applies, *see* CEC MJAR at 43, CEC appears to have withdrawn that argument during the oral argument by adopting Defendant's statements, OA Tr. at 71:5–6 ("We concur with everything that the Government has argued today."). To the extent that CEC did not intend to withdraw its argument about the government control exception (and to the extent CEC even has the ability to assert such an exception in the face of the Government's disavowal), it is evident that the government control exception does not apply here.

The government control exception excuses lateness if "[t]here is acceptable evidence to establish that [the modification] was received at the Government installation designated for receipt

of offers and was under the Government's control prior to the time set for receipt of offers" and "the Contracting Officer determines that accepting the late offer would not unduly delay the acquisition." FAR 52.212-1(f)(2)(i). Neither Defendant nor CEC identifies any document in the record in which the CO determines that accepting CEC's late modification would not unduly delay the acquisition. *See* Def. Reply at 8; CEC Reply at 8. Nor could they, as such a determination is absent from the record. Indeed, at oral argument, Defendant confirmed that "[t]he CO did not" make a determination, which is a required precondition to the application of the government control exception. OA Tr. at 65:19; *see* OA Tr. at 65:20–22 ("[W]e aren't arguing that the 'government control' exception is met here."). As the CO never made the required determination, the government control exception to the late-is-late rule cannot apply. *See* FAR 52.212-1(f)(2)(i).

Although the Court recognizes that this might seem to be an unfair outcome for CEC, which did not itself cause the late delivery of the email, the Court must apply the regulation as written and cannot red pen policy judgments into the FAR. Indeed, it would be inappropriate for the Court to engage in judicial engraftment of the regulations. Accordingly, despite CEC's efforts to reply on time, CEC's June 4 clarifications email was tardy under the applicable regulation and accordingly DEA's consideration of CEC's clarifications in its June 4 email violates the late-is-late rule. *See* FAR 52.212-1(f)(2)(i) (late-received modification "will not be considered").

*4. Prejudice from Acceptance of Late Submission*

Plaintiff must demonstrate prejudice to succeed in the bid protest. *See DynCorp I*, 10 F.4th at 1308. A protestor establishes prejudice by showing "that there was a 'substantial chance' it would have received the contract award but for" that error. *Sys. Stud. & Simulation*, 22 F.4th at 998 (quoting *Bannum*, 404 F.3d at 1353); *see GovCIO*, 177 Fed. Cl. at 593 (describing prejudice

standard as a "low bar"). For the reasons stated below, Plaintiff demonstrates that the violation of the late-is-late rule was prejudicial.

FYI argues that DEA's improper consideration of the clarifications prejudiced it because if DEA had not considered the clarifications, "it would have disqualified CEC." Pl. MJAR at 20. FYI asserts that if CEC had been disqualified, "FYI would have received the award." *Id.* Defendant contends that the improper consideration did not prejudice FYI because CEC "receiv[ed] no benefit from the DEA-caused delay." Def. MJAR at 22. CEC argues that the improper consideration of clarifications was not prejudicial because DEA could have waived CEC's "pricing miscalculation." CEC MJAR at 46.

Plaintiff successfully establishes prejudice because, as a matter of fact, "there was a 'substantial chance' it would have received the contract award" if not for the improper consideration of CEC's untimely clarifications email. *Sys. Stud. & Simulation*, 22 F.4th at 998 (quoting *Bannum*, 404 F.3d at 1353). When an initial proposal is timely received and a secondary submission violates the late-is-late rule, only the initial proposal can be considered. *See, e.g., Centerra Sec. Servs. GmbH v. United States*, 176 Fed. Cl. 219, 234 (2025). DEA initially considered CEC's initial proposal to be "[u]nacceptable" due to the miscalculations. Tab 17b, AR 1133. DEA likely would not have made an award to a quotation that it had deemed to be "[u]nacceptable." *See id.* Without the competition posed by CEC's superior technical evaluation, FYI would have been tied with other quoters who received "HIGH CONFIDENCE" for Factors One and Two and "ACCEPTABLE" for Factor Three, and FYI quoted a lower price than the other quoters in that group. *See* Tab 19, AR 1152 (pricing), Tab 24, AR 1177 (highest rated quotes). If FYI had quoted the lowest price of the quoters receiving the same high rating, and the DEA had not considered CEC's tardy June 4 email modification, then FYI would have had a "substantial

chance" at winning the award; accordingly, FYI has demonstrated prejudice. *Sys. Stud. & Simulation*, 22 F.4th at 998 (quoting *Bannum*, 404 F.3d at 1353).

Defendant's argument against prejudice fails because, contrary to Defendant's argument, CEC received a benefit from the improper consideration of its late submission. Defendant argues that CEC "receiv[ed] no benefit from the DEA-caused delay" because CEC sent its modification before the 1:30 p.m. deadline. Def. MJAR at 22; *see also* Def. Reply at 13 ("[B]ecause C. Evans sent its clarifications response well in advance of the deadline, it did not obtain the competitive advantage the late-is-late rule seeks to prevent."). To the contrary, CEC gained a competitive advantage from the consideration of the late modification, as discussed above. The DEA rated CEC's initial proposal—which is all DEA could consider if it followed the late-is-late rule—as "[u]nacceptable" due to the miscalculations. Tab 17b, AR 1133. After the modification, DEA lauded CEC's offer for "exceeding requirements." Tab 24, AR 1189. This change in evaluation, which favored CEC, was only possible because DEA failed to follow the late-is-late rule. It is of no moment that DEA's own technology appears to have caused the violation, rather than any mistake made by CEC, because the late-is-late rule routinely applies in situations when an offeror timely sends an email but an agency's email software delays receipt. *See, e.g., Rick Aviation*, 182 Fed. Cl. at 61–62; *Kropp Holdings*, 176 Fed. Cl. at 532. The late-is-late rule plainly states that it applies based on the moment that an offer is "received" and, as discussed above, contains no applicable exception here for lateness caused by the government's own errors. *See* FAR 52.212-1(f)(2)(i).

CEC's argument against prejudice also fails. CEC argues that "the CO was well within her discretion to waive the pricing miscalculation that was being corrected, such that FYI could not have been prejudiced by DEA's consideration of CEC's corrected quotation." CEC MJAR at

46. This statement is contradicted by the record before the Court, in which DEA assessed that CEC's original quote, before the clarification, was "[u]nacceptable." Tab 17b, AR 1133. CEC cites several cases in support of the proposition that the CO could have waived the obvious errors in CEC's original quotation. CEC MJAR at 46–47 (citing *T Square Logistics Servs. Corp. v. United States*, 134 Fed. Cl. 550, 557 (2017), *GovWave, LLC v. United States*, 175 Fed. Cl. 564, 656 (2025), *ManTech Advanced Sys. Int'l, Inc. v. United States*, 141 Fed. Cl. 493, 508 (2019)). However, whether the CO could have waived the errors is beside the point. Based on the record before this Court, CEC cannot establish that the CO would have waived the errors because the CO, as a matter of fact, decided to seek clarifications from CEC rather than waive the obvious typographical errors. *See* Tab 14c, AR 704. Even if there was a marginal chance that the CO would have waived an error that rendered a bid "[u]nacceptable," Tab 17b, AR 1133, the Court finds, as a matter of fact, that FYI has established that it had "greater than an insubstantial chance of securing the contract" if DEA could not consider CEC's modified quote, which is sufficient to establish prejudice. *See REV, LLC v. United States*, 91 F.4th 1156, 1163 (Fed. Cir. 2024) (quoting *Info. Tech.*, 316 F.3d at 1319). As such, FYI has established that DEA committed a prejudicial error when it considered CEC's late-received modification email, so FYI has prevailed on the merits of its protest. *DynCorp I*, 10 F.4th at 1308.

### D. <u>CEC's Post-Clarifications Compliance with Competition Requirements</u>

Even if DEA could have considered CEC's post-clarifications quote, FYI argues that DEA was not allowed to make an award to CEC. Pl. MJAR at 25. FYI argues that even after the clarifications, "CEC's revised quote still contains errors." *Id.* FYI also argues that "[a] quote that does not comply with the material terms of a solicitation cannot form the basis for award." *Id.* at

21. CEC argues that to the extent the corrected quotation contains any errors, "those errors do not constitute a material deficiency to CEC's quotation." CEC MJAR at 54.

The error in CEC's post-clarifications quotation appears to have arisen due to a failure to update one cell in a spreadsheet that CEC altered for its clarification. *See* Tab 14c, AR 716. This spreadsheet provides the total number of labor-hours required for base year pricing in the bases of estimates section of the RFQ. *Id.* In its original submission, CEC relied upon an incorrect number of hours for CLIN 0005 and proposed a total of 61,440 hours in a chart showing its base year pricing. *See* Tab 14b, AR 548:

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| 0001 | HR Specialist Jr./Technical Specialist | 5,760 | [redacted] | [redacted] |
| 0002 | Administrative Assistant II | 9,600 | [redacted] | [redacted] |
| 0003 | Program Support Specialist | 1,920 | [redacted] | [redacted] |
| 0004 | Administrative Assistant I | 3,840 | [redacted] | [redacted] |
| 0005 | Classification Specialist | **5,760** | [redacted] | [redacted] |
| 0006 | Senior Recruiter/HR Specialist | 5,760 | [redacted] | [redacted] |
| 0007 | Human Resources Assistant | 23,040 | [redacted] | [redacted] |
| 0008 | Project Specialist | 1,920 | [redacted] | [redacted] |
| 0009 | Program Analyst | 1,920 | [redacted] | [redacted] |
| 0010 | Program Manager | 1,920 | [redacted] | [redacted] |
| | Base Year Total | **61,440** | | [redacted] |

Tab 14b, AR 548 (before modification) (emphasis added). In the clarification, CEC adjusted the quantity and amount for CLIN 0005 to match RFQ requirements, and it updated the base year total amount, but it failed to update the base year total quantity in a chart:

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| 0001 | HR Specialist Jr./Technical Specialist | 5,760 | [redacted] | [redacted] |

| | | | | |
|---|---|---|---|---|
| 0002 | Administrative Assistant II | 9,600 | [redacted] | [redacted] |
| 0003 | Program Support Specialist | 1,920 | [redacted] | [redacted] |
| 0004 | Administrative Assistant I | 3,840 | [redacted] | [redacted] |
| 0005 | Classification Specialist | **7,680** | [redacted] | [redacted] |
| 0006 | Senior Recruiter/HR Specialist | 5,760 | [redacted] | [redacted] |
| 0007 | Human Resources Assistant | 23,040 | [redacted] | [redacted] |
| 0008 | Project Specialist | 1,920 | [redacted] | [redacted] |
| 0009 | Program Analyst | 1,920 | [redacted] | [redacted] |
| 0010 | Program Manager | 1,920 | [redacted] | [redacted] |
| | Base Year Total | **61,440** | | [redacted] |

Tab 14c, AR 716 (after modification) (emphasis added). The base year total quantity proposed remained 61,440 hours, rather than the 63,360 hours that the cell should have now reflected. *See id.* CEC argues that this continued error in this "back-up pricing data" does "not constitute a material deficiency to CEC's quotation."[15] CEC MJAR at 54.

An agency cannot accept an offer that fails to reflect "the material terms and conditions" of the solicitation. *Centech Grp.*, 554 F.3d at 1037; *see E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996) ("[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." (internal quotation marks omitted)). However, "[a] proposal's failure to conform to a term or condition of a solicitation renders the proposal unawardable only if the violation relates to a term or condition that is material." *Oak Grove Techs.*, 116 F.4th at 1379. Agencies may "waive informalities and

[15] CEC also argues that a provision incorporated into the RFQ, Justice Acquisition Regulation (JAR) 2852.212-4, excuses its continued error because it "gives CEC's Schedule of Supplies precedence over all other sections of its quotation and the resulting contract." CEC MJAR at 54. However, that provision does not apply to the quotation here because it can only resolve "inconsistencies" in a "solicitation or contract," not in a quotation or offer. JAR 2852.212-4(s).

minor irregularities in offers received." FAR 52.212-1(g); *see* Tab 10, AR 135 (incorporating FAR 52.212-1 into RFQ). An error in an RFQ is a "minor informality or irregularity" if it is an "immaterial defect in a bid or variation of a bid from the exact requirements of the invitation that can be corrected or waived without being prejudicial to other bidders." FAR 14.405; *see Safeguard Base Operations*, 989 F.3d at 1347 (relying upon FAR 14.405 to define "informalities and minor irregularities" in FAR 52.212-1(g)). A "defect or variation is immaterial when the effect on price, quantity, quality, or delivery is negligible when contrasted with the total cost or scope of the supplies or services being acquired." FAR 14.405. A "contracting officer [is] under no obligation to provide written reasons" documenting or explaining the waiver of an immaterial solicitation requirement. *Oak Grove Techs.*, 116 F.4th at 1380; *see DynCorp I*, 10 F.4th at 1313 ("Generally, contracting officers are not obligated by the APA to provide written explanations for their actions." (quotation omitted)).

The error in the post-clarification quotation is immaterial because it is a minor irregularity, so DEA could properly waive it. *See Oak Grove Techs.*, 116 F.4th at 1380. This calculation error is immaterial because did not materially affect the "price" or "quantity" of services that CEC will provide under the contract. FAR 14.405. Additionally, this calculation error will not affect the quantity available under the contract because the post-modification chart includes the correct quantity for each CLIN. *See* Tab 14c, AR 716. Further, the RFQ specifically names the elements of the price quote that the quote must include, and the sum of all quantities required is not mentioned: "[p]rice quote shall include a price for each and every CLIN, on an all or none basis, multiplied by the estimated quantity per CLIN and sum of all CLINs per year in accordance with the Schedule of Supplies." Tab 11, AR 280. Here, CEC's post-clarification chart correctly represents the final value of the price per CLIN multiplied by the sum of all CLIN quantities for

the base year ($[redacted])—the only mistake in the post-clarification chart concerns the sum of the CLIN quantities in the base year (printed as 61,440 hours, rather than the correct sum of 63,360 hours). Tab 14c, AR 716. To the extent that CEC was even required to include the sum of the quantities of hours provided for each CLIN in the base year, this was an immaterial error because it did not "affect[] cost evaluation." *Centech Grp.*, 554 F.3d at 1038. In addition to being immaterial, the miscalculation did not prejudice other offerors because the quantity of units quoted in the post-clarification chart did not factor into the analysis in the Award Decision Memo, which instead only looked at the unit price proposed for each CLIN. *See* Tab 24, AR 1185. That unit price remained unchanged in CEC's quote. *Compare* Tab 14b, AR 367, 548 (quoting unit price of $[redacted] for CLIN 0005)*, with* Tab 14c, AR 708, 716 (quoting unit price of $[redacted] for CLIN 0005). As the calculation error in CEC's post-clarifications quotation was immaterial and did not prejudice other bidders, it was a "minor irregularit[y]" that DEA could properly waive. FAR 52.212-1(g); *see Oak Grove Techs.*, 116 F.4th at 1380.

## II. Evaluation of Non-Price Factors

Although FYI ultimately succeeds on the merits based on DEA's improper consideration of CEC's modified quotation, for completeness the Court also assesses FYI's MJAR arguments against DEA's evaluation of non-price factors. Plaintiff raises three challenges to DEA's evaluation of non-price factors. Pl. MJAR at 7–9. *First*, for Factor 1, Plaintiff argues that the benefits that DEA identified in CEC's proposal as exceeding the RFQ's requirements did not deserve the praise they received. *Id.* at 7–8. *Second*, Plaintiff argues that DEA illogically failed to give FYI more credit for Factor 2 because FYI, as the incumbent contractor, would have an easier Phase-in. *Id.* at 8. *Third*, Plaintiff argues that DEA improperly negatively assessed its past performance under Factor 3. *Id.* at 8–9. Fundamentally, each challenge amounts to FYI's

expression of disagreement with DEA's evaluation. However, this Court is not empowered to overturn a contract award merely because a losing bidder disagrees with the agency's evaluation. *Harmonia Holdings Grp.*, 999 F.3d at 1408. Rather, FYI bore the burden to identify irrational and prejudicial action by DEA. *See DynCorp I*, 10 F.4th at 1308. As FYI has not identified any such irrational action in Defendant's evaluation of non-price factors, the Court declines to disturb this evaluation.

**A. <u>Factor 1 (Technical Capability)</u>**

For Factor 1 (Technical Capability), DEA promised to "evaluate each Quoter's technical capability to accomplish or satisfy each of the tasks in the SOW." Tab 11, AR 286. According to the RFQ, DEA would specifically evaluate a quoter's ability "to provide high-volume recruitment and onboarding support under tight deadlines." Tab 11, AR 287. In addition, DEA would evaluate whether each quoter "demonstrates the understanding and ability to develop tools to monitor performance and deliverables effectively." *Id.*

*1. Evaluation of CEC Technical Capability*

FYI challenges DEA's finding that two elements of CEC's proposal "constitute[d] discriminators over FYI." Pl. MJAR at 26. Although FYI and CEC received identical adjectival ratings, DEA noted two advantages for FYI in the Award Decision Memo: CEC "exceeded SOW section 6.0(h) applicant inquiries of 200 per month by proven surge capability of 28,000 applicant inquiries per month and offered capability for customized dashboards to track progress during the transition phases exceeding the minimum requirements of the RFQ." Tab 24, AR 1178. FYI argues that it was irrational for DEA to recognize these two strengths. Pl. MJAR at 26. Defendant contends that "these arguments amount to nothing more than disagreements with DEA's qualitative judgments, none of which are sufficient to disturb the award." Def. MJAR at 28. CEC

asserts that it deserved the discriminators as a reward for "its incredibly detailed response to the RFQ's requirements." CEC MJAR at 21.

DEA rationally found that it was an advantage for CEC to have surge capacity to process applications beyond the RFQ's requirements. The RFQ stated that the contractor must be able to "[r]espond to applicant inquiries" at a rate of 200 per month. Tab 11, AR 266. The RFQ also stated that the contractor had to "[r]eview applications," although there was no stated metric for required application reviews. Tab 11, AR 253. CEC's bid stated that it had previously handled contracts that "required 7,000 applicant reviews . . . a week to meet hiring surge requirements," and that the firm had exceeded that requirement. Tab 14b, AR 395. DEA identified this ability as a discriminator: "[p]roven surge capability callout—7K applicant reviews a week required, vendor carried out 42 weeks 322K applicant reviews exceeding req."[16] Tab 18a, AR 1135. FYI argues that it was irrational for DEA to identify CEC's past performance with applicant reviews as a discriminator when the RFQ only provided a specific metric for responses to applicant inquiries. Pl. MJAR at 26. However, it was entirely rational for DEA to determine that a contractor that could review a high volume of applications could provide the required support for the recruiting and staffing requirements under the contract. *See* Tab 18a, AR 1135. DEA considered the surge capability for reviews completed as part of a broader explanation that CEC's "[s]urge capacity is well established in this proposal and supporting experience." *Id.* It was not unfair for DEA to highlight an offeror's capabilities to accomplish a required task in the RFQ, even though the RFQ

[16] FYI also argues that DEA misunderstood CEC's proposal because the Award Decision Memo cites the number of applicant *reviews* that CEC claims it can perform as evidence that CEC can exceed the number of applicant *inquiries* that CEC can respond to per month. Pl. MJAR at 26–27; *see* Tab 24, AR 1178. However, the record reflects that DEA understood the distinction, notwithstanding this discrepancy, and that DEA identified the surge capacity for applicant reviews on its own as a positive factor in CEC's favor. *See* Tab 18a, AR 1135.

did not require offerors to meet a metric for that particular task. *See DigiFlight, Inc. v. United States*, 167 Fed. Cl. 158, 171–73 (2023) (*DigiFlight II*) (upholding agency's assignment of a strength for proposing to provide personnel not specified in solicitation).

Similarly, DEA was allowed to assign strengths for CEC's assessed ability to exceed the High Confidence rating. Neither the RFQ nor the FAR limits DEA's evaluation to an offeror's ability to satisfy adjectival ratings. *See* Tab 11, AR 285; FAR 52.212-2(a). The Court of Federal Claims has repeatedly upheld an agency's assessment as rational when one offeror has more strengths under an evaluation factor even if two offerors receive the same adjectival rating. *See, e.g., IT Enter. Sols. JV, LLC v. United States*, 132 Fed. Cl. 158, 174 (2017) ("[T]he [agency] clearly concluded that [awardee] had demonstrated a superior level of past performance confidence, even if it was assigned the same adjectival rating as [protester]."); *see also Insight Pub. Sector*, 161 Fed. Cl. at 796 (holding in Subpart 8.4 procurement that "proposals with the same adjectival rating are not necessarily of equal quality" (quoting *Sys. Application & Techs., Inc. v. United States*, 100 Fed. Cl. 687, 719 (2011), *aff'd*, 691 F.3d 1374 (Fed. Cir. 2012))); *AMES 1, LLC v. United States*, 162 Fed. Cl. 1, 22 (2022) ("An agency's review beyond the overall . . . adjectival ratings ensures that the agency can 'determine which proposal represents the best value for the government.'" (quoting *E.W. Bliss*, 77 F.3d at 449)); *IAP World Servs., Inc. v. United States*, 152 Fed. Cl. 384, 409 (2021) ("Adjectival ratings by themselves are not determinative because '[p]roposals with the same adjectival rating are not necessarily of equal quality.'" (quoting *Metcalf Const. Co. v. United States*, 53 Fed. Cl. 617, 641 (2002))); *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 758 (2008) ("Looking beyond the adjectival ratings is necessary."). Similarly, another judge on the Court of Federal Claims has held that an agency can identify strengths that exceed the minimum requirements set forth in the solicitation as differentiators for a Subpart 8.4 best value procurement.

*See DigiFlight II*, 167 Fed. Cl. at 171–73. While not binding, the Court finds *DigiFlight II* persuasive. As such, DEA did not violate the RFQ when it assessed strengths beyond the adjectival ratings. *See id.* As DEA was allowed to assess an evaluation exceeding adjectival ratings and explained the reasoning that led to that evaluation, the Court will not impose its own judgment concerning what is or is not an indicator of likely successful performance. *See Ala. Aircraft Indus.*, 586 F.3d at 1375–76.

DEA also rationally found that it was an advantage that CEC "offered capability for customized dashboards to track project progress during the transition phases." Tab 24, AR 1178. FYI argues that this advantage is irrational because it "cannot be reconciled with the [source selection authority's] separate finding that FYI requires no transition-in period." Pl. MJAR at 28. FYI's allegation of an unfair evaluation discrepancy between the advantages of CEC's dashboards and FYI's lack of a Phase-in period cannot be found in the record, which never directly compares the two.[17] Tab 24, AR 1178, 1180. Rather, the record reveals that the Award Decision Memo identified each element (CEC's dashboards and FYI's lack of a Phase-in period) as a strength in a review of each individual submission, not in a direct comparison of the CEC and FYI offers. *See id.* DEA never said that it would directly compare aspects of quotes head-to-head; rather, the RFQ states that each "quote will be evaluated against the evaluation factors in this RFQ." Tab 11, AR 285. Similarly, the award justification never states that the value of the dashboards outweighed the value of having no Phase-in period. *See* Tab 24, AR 1189. Instead, the Award Decision Memo merely states that CEC's dashboards "exceed[] the minimum requirements of the RFQ." Tab 24,

[17] To the extent that FYI challenges the agency's weighing of different benefits provided by each quoter in the best value determination, the Court addresses that determination in a separate section. *See infra* Discussion III. Similarly, to the extent that FYI argues it deserved higher ratings under Factor 2 (Transition), the Court addresses that evaluation in a separate section. *See infra* Discussion II.B.

AR 1178. It is rational for an agency to determine that greater visualization and knowledge of its own data will support operational efficiency, as DEA's evaluation team determined regarding the dashboards that CEC proposed. Tab 18a, AR 1135. The DEA, not this Court, is best situated to determine what contractor solutions will best exceed expectations and support agency operations, and this Court will not disturb DEA's thoroughly explained technical evaluation. *See Ala. Aircraft Indus.*, 586 F.3d at 1375–76.

*2. Evaluation of FYI Technical Capability*

Although FYI received the highest adjectival confidence rating available ("High Confidence") for Factor 1, it now contends that DEA "withheld evaluation credit from aspects of FYI's quote that exceed requirements once the evaluators determined to assign FYI a High Confidence rating." Pl. MJAR at 29. Defendant argues that DEA did all it was required to do, as "DEA assessed each quotation against the RFQ's stated criteria." Def. MJAR at 32. CEC argues that "FYI asks the Court to substitute its judgment for that of the Agency's, which this Court will not do." CEC MJAR at 26. CEC also argues that FYI has not met the high bar to demonstrate disparate evaluation. *Id.* The Court holds that DEA did not need to find that FYI's proposal exceeded minimum requirements and that DEA did not disparately evaluate the quotes.

FYI argues that DEA "failed to recognize additional ways in which FYI exceeded the stated metrics," but FYI never identifies any obligation for DEA to do so in the RFQ. *See* Pl. MJAR at 30. For example, FYI stated in its quotation that it had "responded to [redacted] inquiries" in a three-month period, but the Award Decision Memo did not identify this as an advantage. Tab 15b, AR 927, Tab 24, AR 1180. FYI argues that it was unfair for DEA to highlight CEC's ability to exceed requirements for this metric, but not to highlight FYI's similar abilities. Pl. MJAR at 30. However, the RFQ did not obligate DEA to identify ways that an offeror exceeded stated metrics; instead,

the RFQ stated only that each "quote will be evaluated against the evaluation factors in this RFQ." Tab 11, AR 285. An agency has discretion not to assign strengths beyond adjectival ratings where it has considered the information before it. *See DigiFlight II*, 167 Fed. Cl. at 164–65. DEA performed the required evaluation and gave FYI a "High Confidence" rating for Factor 1, the highest score that was available under the RFQ. Tab 24, AR 1174, 1177. The record reveals that this evaluation was based on an individualized assessment of the information that FYI provided in its quote. *See* Tab 24, AR 1180. Beyond that determination, the Court cannot determine as a matter of law which technical ratings may have been notable enough to exceed expectations, and thus cannot determine that DEA acted irrationally in not stating that FYI's proposal exceeded expectations. *See Harmonia Holdings Grp.*, 999 F.3d at 1408 ("Our role in reviewing procurement decisions, however, is not to evaluate the offerors' proposals anew or to substitute our judgment for that of the agency."). Similarly, DEA is better equipped than the Court to determine whether responding to [redacted] inquiries in three months is as valuable to DEA as reviewing 7,000 applications in a week. *See E.W. Bliss*, 77 F.3d at 449 ("[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess.").

While this Court can review whether DEA disparately evaluated offers, FYI has not met the exacting standard to prove a disparate evaluation here. To establish a disparate evaluation, "a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020). Here, FYI and CEC's proposals were not "substantively indistinguishable." *See id.* FYI complains that DEA specifically credited CEC, but not FYI, for mentioning DEAHire, a program that DEA uses for recruitment. Pl. MJAR at 30–31. However, FYI cannot demonstrate that its explanation of

DEAHire in its approach was "substantively indistinguishable" from CEC's explanation in its own quotation. *See Off. Design Grp.*, 951 F.3d at 1372. DEA credited CEC for its "[s]pecific mention of DEAHire." Tab 18a, AR 1135. CEC did, in fact, specifically mention DEAHire in a sentence of the quotation: "we are well-positioned to quickly learn and adapt to DEAHire." Tab 14b, AR 375. In contrast, FYI does not specifically focus on DEAHire, but instead simply lists DEAHire as one of many platforms that its employees have worked with: "We have provided DEA with HR professionals who are experts and work with a high degree of accuracy in the suite of federal HR systems used by DEA to include: USA Staffing, DEA Hire, NFC, EmpowHR, and e-OPF." Tab 15b, AR 918. An entire sentence about CEC's commitment to DEA Hire is not "substantively indistinguishable" from FYI's unadorned mention of DEA Hire in a list of five programs, so FYI's disparate evaluation claim cannot succeed. *Off. Design Grp.*, 951 F.3d at 1372; *AccelGov, LLC v. United States*, 164 Fed. Cl. 345, 363 (2023) (finding that proposals to use a service desk hotline were "not substantively indistinguishable" when explanations of proposed hotlines differed).

In addition, FYI argues that its proposed personnel were equally or more qualified than CEC's, but that DEA only commented on the quality of CEC's proposed staff. Pl. MJAR at 31. However, the proposed staff are composed of different individuals with different experiences, and "two different management teams, one made up of entirely different individuals than the other, . . . cannot be substantively indistinguishable." *Steel Point Sols., LLC v. United States*, 180 Fed. Cl. 463, 475 (2026); *see Golden IT, LLC v. United States*, 177 Fed. Cl. 118, 145 (2025) ("[N]amed key personnel are inherently different—they're specific people after all—and resumes are by their nature very rarely 'substantively indistinguishable' from each other."). For example, CEC's proposed program manager has "[redacted] years of experience leading high-impact, cross-functional initiatives," while FYI's proposed program manager has "[redacted] years of HR experience," but

only [redacted] years of experience in leadership roles. Tab 14b, AR 407, Tab 15b, AR 961. These resumes are "substantively different" because one proposed person reports less experience overall but more experience in a leadership role. *See Steel Point*, 180 Fed. Cl. at 475. As the proposed key personnel are not "substantively indistinguishable," FYI cannot demonstrate that its key personnel were disparately evaluated. *See Off. Design Grp.*, 951 F.3d at 1372.

### B. <u>Factor 2 (Transition)</u>

FYI argues that DEA wrongly assessed FYI and CEC the same adjectival rating for Factor 2 and argues that DEA disparately evaluated the two offers. Pl. MJAR at 31 ("The record confirms that the Agency failed to distinguish FYI and CEC under Factor 2 (Transition), in contravention of the RFQ and procurement law, and then compounded its error by treating CEC and FYI unequally."). Defendant argues, to the contrary, that FYI misreads the evaluation criteria and ignores substantive differences in the transition plans. Def. MJAR at 37–38. CEC argues that DEA followed the RFQ's requirements and that the proposals were not disparately evaluated under Factor 2. CEC MJAR at 29–30.

#### *1. Similar Evaluation of Transition*

FYI and CEC each received a "HIGH CONFIDENCE" rating for Factor 2, the highest rating available in the evaluation. TAB 24, AR 1174, 1177. FYI, though, argues that it was entitled to a higher rating because, as the incumbent contractor, "FYI provided considerable advantages relative to the stated criteria." Pl. MJAR at 33 ("Beyond its obvious staffing advantage, FYI emphasized other aspects of its transition that would further diminish risk, including FYI's familiarity and preexisting relationships with DEA stakeholders."). FYI argues that the terms of the RFQ required DEA to grant a higher score to offerors who exceeded minimum requirements. *Id.* at 34.

However, Plaintiff's cited authorities undermine its argument: the authorities to which FYI cites reveal that the RFQ did not require DEA to give extra credit for surpassing minimum requirements in this procurement. *See* Pl. MJAR at 34. FYI cites the evaluation criteria in the RFQ and the decision of the Government Accountability Office[18] (GAO) in the matter of *emissary LLC*, B-422388 et al., 2025 CPD ¶ 177 (Comp. Gen. July 29, 2025). *Id.* To the extent that *emissary* is persuasive, it stands for the proposition that "[w]here a solicitation indicates that the agency will evaluate the 'extent' a proposal meets a particular requirement, offerors can reasonably expect that a proposal exceeding the agency's minimum requirements will garner a more favorable evaluation than one that merely meets the requirements." *emissary*, 2025 CPD ¶ 177, at 6. There, solicitation language stated that the agency would evaluate Phase-in proposals for "the extent to which the Offeror's plan is determined to demonstrate detailed methods the Offeror will implement to become fully functional." *Id.* at 6. The solicitation did not limit the agency to an evaluation of Phase-in plans on "a pass/fail basis where it considered nothing more than the adequacy of the offerors' plans," so the agency had to consider the incumbent contractor's ability to exceed minimum standards for the phase-in. *Id.* at 7.

In contrast, in the procurement at issue, the RFQ explicitly limits the evaluation of Factor 2 to "the degree to which the proposed approach **meets or does not meet the minimum** performance or capability requirements." Tab 11, AR 286 (emphasis added). The key words here are "meet[]" and "minimum"—the adjectival ratings in this procurement do not reflect anything more than an ability to "meet the minimum performance or capability requirements." *Id.* Proposing other solutions that could allow an offeror to exceed minimum requirements for Phase-

[18] While GAO decisions can be persuasive, they are not binding on this Court. *See SH Synergy, LLC v. United States*, 165 Fed. Cl. 745, 768 n.24 (2023).

in would not lead to an advantage in adjectival scores. Tab 11, AR 234 ("[P]reference is not given to vendors proposing incumbent staff."). Unlike the agency in *emissary*, DEA told offerors that it would assign adjectival ratings to transition plans on what amounts to a "pass/fail basis." *emissary*, 2025 CPD ¶ 177, at 7; *see* Tab 11, AR 286. As DEA stated that the rating assigned for Factor 2 would only reflect the ability to meet minimum requirements, DEA did not act irrationally or violate the terms of the RFQ when it assigned FYI and CEC the same high score because each of their proposals met requirements, even if FYI's incumbency was a natural advantage. *See* Tab 11, AR 286 (defining adjectival ratings as ability to "meet . . . minimum performance or capability requirements"), Tab 24, AR 1177 (assigning "HIGH CONFIDENCE" scores under Factor 2 to FYI and CEC). In addition, FYI's incumbent status did not entitle it to assessment of exceeding standards beyond the adjectival ratings. *See DigiFlight II*, 167 Fed. Cl. at 165 ("[Plaintiff] does not sufficiently establish that an offeror's incumbency status should always be treated as uniquely important."); *Integrated Fin. & Acct. Sols.*, 161 Fed. Cl. at 492 ("[Agency] may not award [Plaintiff] strengths due to its incumbent status because the RFQ does not disclose any advantage related to incumbency.").

*2. Disparate Evaluation of Transition*

FYI argues that DEA engaged in a disparate evaluation of Factor 2 by "lauding attributes of CEC's approach while ignoring virtually the same (or superior) attributes in FYI's approach." Pl. MJAR at 34. As with the evaluation of Factor 1, FYI cannot establish that its proposal was "substantively indistinguishable" from CEC's, so FYI cannot meet the elements for a disparate evaluation claim. *See Off. Design Grp.*, 951 F.3d at 1372.

FYI first argues that DEA's evaluation credits CEC for stating that its "first priority is to retain high performing incumbent personnel with organizational knowledge" but does not credit

FYI for allegedly similar statements. Pl. MJAR at 35; Tab 14b, AR 401. However, the plans outlined by each offeror are not "substantively indistinguishable," even if FYI identifies some similar words. *Off. Design Grp.*, 951 F.3d at 1372. CEC's proposal states that its "first priority is to retain high performing incumbent personnel with organizational knowledge" and then continues with a description of how CEC will contact and recruit potential personnel:

> We will reach out to incumbent personnel immediately, holding [redacted] to ensure clear and immediate communication with all personnel and defuse any concerns or misinformation. Next, our PM will coordinate with HR to [redacted]. Team CEC will leverage our accelerated onboarding and training [including [redacted], etc.] to ensure that all staff are oriented and prepared to perform effectively on Day One of contract performance.

Tab 14b, AR 401. In contrast, FYI writes that it would "[i]dentify and recruit high performing incumbent personnel" but does not specify in any greater detail how it would recruit the personnel. Tab 15b, AR 945. The several extra sentences of detail in CEC's proposal distinguishes the offers. *See* Tab 14b, AR 401. As the offerors included different levels of detail, their quotations are not "substantively indistinguishable." *See Off. Design Grp.*, 951 F.3d at 1372; *Steel Point*, 180 Fed. Cl. at 474 (finding offers not substantively indistinguishable when one offer "incorporates more detailed discussion of its use of" management approaches); *AccelGov, LLC*, 164 Fed. Cl. at 363. It is within DEA's competence, not the Court's, to say whether the more specific explanation of recruitment provides a benefit to the agency, and the Court defers to DEA's rational explanation of its evaluation. *See Harmonia Holdings Grp.*, 999 F.3d at 1408; Tab 18a, AR 1136–37 (TEP Factor 2 evaluation of CEC), Tab 18b, AR 1141 (TEP Factor 2 evaluation of FYI).

Next, FYI argues that DEA performed a disparate evaluation when it credited "CEC only for accounting for incumbent personnel and full assumption of responsibility by transition day 30,"

whereas FYI received no credit for promising to assume responsibility by the first day. Pl. MJAR at 35–36. Evaluating the record, it is clear that DEA noted the distinction between the proposals and credited FYI with the advantage of being able to assume responsibility on the first day. Tab 18b, AR 1141. Regarding FYI's ability to phase-in immediately as the incumbent, the Technical Evaluation Panel took that into account, writing that DEA "can leverage transition window yielding improvements to DEA." *Id.* The Award Decision Memo highlighted the same advantage of FYI's proposal: "as the incumbent, there is no requirement for a transition period." Tab 24, AR 1180. In contrast, considering CEC's promise to assume responsibility by day 30 of the phase-in period, the Technical Evaluation wrote "RFQ requirements met and all components addressed." Tab 18a, AR 1136. In these statements, DEA appears to have recognized the likely Phase-in advantage provided by FYI's status as the incumbent contractor. *See id.* Plaintiff cannot show DEA "unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals" regarding the time needed for transition because the proposals were different and DEA recognized the strength of the reduced Phase-in window. *See Off. Design Grp.*, 951 F.3d at 1372; Tab 24, AR 1180.

Finally, FYI claims that another one-sentence snippet of the Technical Evaluation Panel's assessment evinces a disparate evaluation. FYI argues that DEA credited CEC for designating a "specific key member . . [.] to handle the transition plan" but failed to credit FYI for a similar commitment. Pl. MJAR at 36 (quoting Tab 18a, AR 1136). Here, again, FYI and CEC proposed plans that were not "substantively indistinguishable," so Plaintiff cannot establish a claim of disparate evaluation. *Off. Design Grp.*, 951 F.3d at 1372. DEA did not just credit CEC for having a designated supervisor for the transition but wrote specifically that the inclusion of a "[redacted]" was a "novel approach to handling this." Tab 18a, AR 1136. CEC's description

of the [redacted] included the following details: [redacted]; descriptions of the roles of each team; a commitment to [redacted]; the aforementioned customized dashboards; and a [redacted] (beginning before the Phase-in period) for nine separate Phase-in milestones. Tab 14b, AR 399–400. FYI's identification of [redacted] as someone who will provide "leadership during transition and throughout delivery" is simply not "identical" to CEC's proposal, despite FYI's arguments, because it provides a different solution. *See* Pl. MJAR at 36 (quoting Tab 15b, AR 944). Unlike CEC's quotation, FYI does not propose making "leadership during transition" the focus of any employee's work; FYI's quotation instead states that its [redacted] will "support[]" the Phase-in process. *Compare* Pl. MJAR at 36 (quoting Tab 15b, AR 944) ("leadership"), *with* Tab 15b, AR 946 ("support[]"). As these descriptions of leadership and staffing reflect different commitments to Phase-in plans during the Phase-in period and thus are not "substantively indistinguishable," DEA did not disparately evaluate the proposals. *See Off. Design Grp.*, 951 F.3d at 1372.

### C. <u>Factor 3 (Past Performance)</u>

FYI argues that DEA also unreasonably evaluated Factor 3 (Past Performance). Pl. MJAR at 37. FYI and CEC each received an "ACCEPTABLE" rating for Factor 3, the highest adjectival rating available. Tab 24, AR 1174, 1177. FYI argues that although it received the highest rating available, "the record contains several evaluator criticisms of FYI that diminished FYI's relative competitive standing." Pl. MJAR at 37. FYI argues that these criticisms are contradicted by the record and that it was irrational for DEA not to consider the most recent report on FYI's incumbent contract in the Contractor Performance Assessment Reporting System (CPARS). *Id.* at 37–38.

Defendant responds that DEA rationally evaluated the past performance information and was not required to consider the most recent Contractor Performance Assessment Report (CPAR). Def. MJAR at 40–41. CEC argues that DEA did not err in its evaluation of FYI's past performance and that any error would not have been prejudicial. CEC MJAR at 31–36.

FYI faces a high bar to demonstrate that the past performance evaluation was irrational. "Agency past performance evaluations are entitled to 'the greatest deference possible.'" *Garrett Elecs., Inc. v. United States*, 163 Fed. Cl. 632, 666 (2023) (quoting *Alisud-Gesac Handling – Servisair 2 Scarl v. United States*, 161 Fed. Cl. 655, 668 (2022)); *see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 909–10 (Fed. Cir. 2013) (agencies have "broad discretion" to measure and evaluate an offeror's past performance). An agency's evaluation of an offeror's past performance "often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to [such] determinations." *Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 395 (2005); *see also E.W. Bliss*, 77 F.3d at 449 (courts should not second guess "discretionary determinations of procurement officials" that "deal with the minutiae of the procurement process in such matters as technical ratings"). A court's review of an agency's past performance evaluation should thus be limited to ensuring the evaluation was reasonable and consistent with the stated evaluation criteria. *See Am. Auto Logistics, LP v. United States*, 117 Fed. Cl. 137, 185–86 (2014). "This Court will not upset the agency's rating simply because plaintiff was the incumbent and believes its experience to be superior." *Bowhead Enter., Sci. and Tech., LLC v. United States*, 179 Fed. Cl. 1, 20 (2025) (cleaned up) (quoting *United Concordia Cos. v. United States*, 99 Fed. Cl. 34, 45 (2011)).

*1. Evaluation of FYI's Performance as Incumbent*

FYI offers three reasons why DEA's evaluation of FYI under Factor 3 was unreasonable. Pl. MJAR at 37–38. First, FYI argues that the Technical Evaluation Panel unreasonably stated that FYI's CPARs "do not reflect the same scope as the instant effort." *Id.* at 37. Second, FYI argues that the Technical Evaluation Panel's statement that "[t]here have been [redacted] issues" with [redacted] irrationally conflicts with information in the record. *Id.* at 37–38. Third, FYI argues that it was unreasonable for DEA not to consider its most recent CPAR. *Id.* at 38. For the reasons explained below, each argument fails.

DEA rationally justified its statement that "[t]he CPARs provided do not appear to be at a similar scale/scope as our requirement; task areas do not align." Tab 18b, AR 1142. As Plaintiff itself acknowledges, DEA could not locate FYI's CPAR for the incumbent contract. Pl. MJAR at 38; Tab 42, AR 2462–63. FYI does not offer any evidence, or even argue, that the other CPARs DEA considered were for projects of a similar scale or scope. *See* Pl. MJAR at 37. In addition, even if DEA accessed the CPAR for the incumbent contract, changes between the incumbent contract and the RFQ, which FYI acknowledges exist, may have made the new contract different in scope. Tab 18b, AR 1142. DEA's evaluators found that FYI acknowledged the increased scope because FYI's quotation required "adding some [redacted]" compared to the incumbent contract. *Id.* FYI does not identify any evidence that proves that the addition of the [redacted] could not render the new DEA contract different in scope, and "[d]eterminations regarding the degree of similarity between past performance examples and the contract that is the focus of the procurement are subjective and lie within the expertise of the Agency." *AAR Gov't Servs., Inc. v. United States*, 180 Fed. Cl. 587, 604 (2026). As such, DEA's evaluation rationally stated that

"[t]he CPARs provided do not appear to be at a similar scale/scope as our requirement." Tab 18b, AR 1142.

It was not inconsistent with the record for DEA's evaluation to note that [redacted] Tab 18b, AR 1143. The evaluation attributed this statement to the "Government's own knowledge/experience." *Id.* FYI argues that this evaluation is inconsistent with FYI's CPAR covering the period ending May 24, 2022 (which DEA did not consider), which states that "[t]he vendor was [redacted] The [redacted]." Tab 41, AR 2446; *see* Pl. MJAR at 37. There is no inconsistency between the evaluation and the CPAR because there is no indication that they concern FYI's performance during the same time period. The evaluation is dated July 7, 2025, but the CPAR is for a period ending May 24, 2022—the evaluation may have been based on more recent performance than that which the CPAR evaluated. *Compare* Tab 18b, AR 1139*, with* Tab 41, AR 2445. In addition, the terms of the RFQ allowed DEA to consider the evaluator's experience and disregard the CPAR, as the RFQ states that "[i]nformation from the Quoter will be considered as well as information obtained from other sources, which **may** include . . . the Government's own knowledge/experience, and/or . . . CPARS." Tab 10, AR 147 (emphasis added). Here, even if there was an inconsistency, that would not mean DEA acted irrationally as the terms of the RFQ allowed DEA to credit one source of information (its own experience) over another (the CPAR). *Id.*; *see AAR Gov't Servs.*, 180 Fed. Cl. at 603 ("[T]o the extent a conflict existed, it was up to the Agency to decide which source to credit.").

Finally, DEA did not act unreasonably when it did not evaluate FYI's most recent CPAR. FYI argues that the "too close at hand" doctrine required DEA to consider the CPAR. Pl. MJAR at 38. The too close at hand doctrine holds that "if a government agency possesses personal knowledge or internal information pertaining to an offeror's contract or prior work, the agency may be obligated to consider that information even if the offeror did not cite the information in a proposal." *ProSecure LLC v. United States*, 151 Fed. Cl. 697, 707 (2020); *see Integrated Fin. & Acct. Sols., LLC v. United States*, 161 Fed. Cl. 475, 490 (2022) ("Under the too close at hand doctrine, there is certain information about past performance that if the agency is aware of, it cannot ignore."). Here, FYI cited its own experience in its proposal, and DEA considered that experience (albeit not the exact piece of information FYI cited) in its evaluation. *See* Tab 18b, 1143 (citing "Government's own knowledge / experience" of incumbent contract). This qualifies as consideration of "personal knowledge or internal information" that satisfies the too close at hand doctrine. *See ProSecure*, 151 Fed. Cl. at 707. The issue in this case resembles *Bowhead*, in which a plaintiff invoked the too close at hand doctrine to challenge an agency's choice not to consider all the past performance reports of plaintiff's subcontractor. *Bowhead*, 179 Fed. Cl. at 20–21. There, as here, the solicitation used permissive language in defining the sources of information that the agency could consider. *Compare id.* at 21*, with* Tab 10, AR 147. In *Bowhead*, it was reasonable for the agency not to credit plaintiff for the past performance reports of plaintiff's subcontractor when the record established that the agency had, in fact, reviewed that past performance and determined that it did not justify a higher assessment for plaintiff. *Bowhead*, 179 Fed. Cl. at 21 ("There is a stark difference, however, between an agency's failure to *consider* readily available information and an agency's disputed *appreciation* of that data." (emphasis in original)). Here, similarly, DEA considered its own knowledge of FYI's performance and merely

reached a different conclusion about that performance than FYI wished. Tab 18b, 1143. That consideration satisfies DEA's responsibility under the too close at hand doctrine. *See Bowhead*, 179 Fed. Cl. at 21.

*2. Prejudice for Highest Rating*

FYI cannot demonstrate that it was prejudiced when it received the highest past performance rating available under the RFQ, or that the negative comments in its evaluation made a difference in the final evaluation. The Court finds, as a matter of fact, that even if DEA's Technical Evaluation Panel erred in its past performance evaluation, the error would have not have been prejudicial, so Plaintiff's claim still would not succeed. *See Sys. Stud. & Simulation*, 22 F.4th at 998 (Court of Federal Claims makes "factual findings underlying the prejudice determination."). FYI contends that critical statements in the evaluation were prejudicial because "[w]ith the criticisms removed, the evaluators likely would view FYI as superior to CEC under Factor 3 and FYI likely would have received the award." Pl. MJAR at 39. The record contravenes FYI's argument for two reasons. First, the Award Decision Memo disregarded the critical comments from the Technical Evaluation Panel concerning the scope of past performance and said that "FYI demonstrated experience in providing human resource staffing of similar size, scope, and complexity." Tab 24, AR 1180. A statement in a Technical Evaluation Panel report is not prejudicial if the relevant source selection authority (here, the CO) disregards that statement in the final decision document (the Award Decision Memo). *WellPoint Mil. Care*, 953 F.3d at 1380 ("[W]e need not be concerned with errors in the interim reports . . . unless they were carried forward to the [Source Selection Authority's] final decision."). Second, the Award Decision Memo identifies CEC's technical capabilities, such as the number of applicant inquiries and the customized dashboards, and not CEC's past performance as differentiating factors that allow CEC

to "exceed the DEA's needs." Tab 24, AR 1178. FYI presents no contrary evidence that the past performance evaluation was prejudicial. *See* Pl. MJAR at 39 (citing no evidence in the AR for prejudicial effect of past performance evaluation). Thus, the facts in the record indicate that even if the Technical Evaluation Panel had not criticized FYI's past performance, that change would not have affected the outcome of the procurement, so FYI demonstrates no prejudice. *See WellPoint Mil. Care*, 953 F.3d at 1377; *Bannum*, 404 F.3d at 1353–54. Thus, even if DEA had irrationally evaluated Factor 3, Plaintiff would have failed to meet its burden, as a plaintiff must demonstrate prejudice to overturn a procurement based on irrational decision-making by an agency. *See DynCorp I*, 10 F.4th at 1308.

## III. Best Value Determination

Although FYI has succeeded on the merits based on DEA's improper consideration of CEC's modified quotation, for completeness the Court assesses FYI's MJAR arguments against the best value determination. Pl. MJAR at 39–43. "An agency's award decision is 'least vulnerable to challenge when based upon a best value determination.'" *Garrett Elecs.*, 163 Fed. Cl. at 672 (quoting *PlanetSpace Inc. v. United States*, 96 Fed. Cl. 119, 125 (2010)); *see Galen Med. Assocs.*, 369 F.3d at 1330. "Procurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss*, 77 F.3d at 449. In particular, in a FAR Subpart 8.4 best value procurement, "the Agency is neither expected nor required to document every decision it makes in rigorous detail." *Integrated Fin. & Acct. Sols.*, 161 Fed. Cl. at 496. "Accordingly, this Court is to afford both leeway to the Agency's documentation of its action and even greater deference to the Agency in a best value procurement." *Steel Point*, 180 Fed. Cl. at 479.

FYI quoted a price of $9,240,633.60, while CEC quoted a price of $9,313,152.00; the difference is $72,518.40, or 0.78% of CEC's quoted price. Tab 19, AR 1152. FYI argues that DEA's best value determination is irrational because it does not adequately explain DEA's decision.[19] Pl. MJAR at 41. Defendant argues, to the contrary, that the "tradeoff analysis was reasonable and within [DEA's] discretion." Def. MJAR at 44. Similarly, CEC contends that DEA rationally explained its decision. CEC MJAR at 37.

The RFQ minimized the impact of price differences upon the best value determination in this procurement:

> All evaluation factors other than cost/price, when combined, are significantly more important than cost or price. As technical differences narrow between quotes, cost/price will become more important.

Tab 11, AR 288. The Contracting Officer wrote the following sentence under the heading "Award Decision" in the Award Decision Memo:

> The High Confidence Rating of [CEC's] quote across all non-price factors along with their exceeding requirements offsets the higher price of their quote when compared to lower priced proposals which received equal or lower confidence level ratings across the non-price factors.

Tab 24, AR 1189. FYI asserts that this explanation is insufficient because it does not adequately explain the decision or "comparatively assess[] the quoters." Pl. MJAR at 41. FYI compares this sentence to the insufficient reasoning exhibited in a Subpart 8.4 procurement in *DigiFlight, Inc. v. United States*, 165 Fed. Cl. 588 (2023) (*DigiFlight I*). *Id.* at 40–41.

---

[19] FYI also contends that DEA's "best value determination is arbitrary and capricious because it derives from an underlying evaluation which contains prejudicial errors." Pl. MJAR at 40. However, as recounted above, the underlying evaluation did not contain prejudicial errors. *See supra* Discussion II. "As Plaintiff's . . . argument that the best value analysis was flawed rests on the proposition that errors were made in the evaluation of technical factors, and it has not adequately demonstrated such errors, this claim fails." *Steel Point*, 180 Fed. Cl. at 479.

DEA's best value determination in this procurement does not bear the flaws seen in *DigiFlight I*, in which the procuring agency fell "woefully short" of explaining its decision in a because neither the technical evaluation nor the best value tradeoff justified award. *See* 165 Fed. Cl. at 608. Crucially, the agency in *DigiFlight I* failed to justify its decision because the underlying technical evaluation and the tradeoff analysis were each insufficient. *Id.* The technical evaluations were "incredibly repetitive and completely conclusory," as the agency provided substantively identical technical evaluations for each offeror. *Id.* at 607–08. The tradeoff analysis was so sparse that "the Court [could] neither tell what the evaluation methodology actually was for selecting the awardee nor discern the rationale for the tradeoff analysis." *Id.* at 608. Due to the sparse and conclusory reasoning, the best value determination was irrational. *Id.* at 610.

The instant procurement does not contain the same lack of reasoning as seen in *DigiFlight I*. *See* Tab 24, AR 1177–90. Whereas the technical evaluation in *DigiFlight I* provided nearly identical five-sentence explanations of each offer, the Award Decision Memo in this case contains a full paragraph of reasoning for each of 13 offerors, which references specific details of each offer. Tab 24, 1178–82. For CEC, the Award Decision Memo reviews specific comments from the technical evaluation, highlights the elements of CEC's proposal that exceeded minimum standards, and concludes that "DEA has high confidence that the quoter will not only meet but exceed the DEA's needs." Tab 24, AR 1178. For FYI, the Award Decision Memo reviews specific comments from the technical evaluation, notes that "there is no requirement for a transition period due to FYI's incumbent status," and concludes that FYI "meet[s] the minimum requirement of the RFQ." Tab 24, AR 1180. The Award Decision Memo does not conclude that any offeror but CEC would exceed requirements in its review of the technical evaluation. *See* Tab 24, 1178–82. The one-sentence explanation of the best value tradeoff flows from this conclusion: CEC's "exceeding

requirements offsets the higher price of their quote when compared to lower priced proposals." Tab 24, AR 1189. This reasoning is far more thorough than the insufficient reasoning in *DigiFlight I* because DEA explains the individualized technical evaluation of each proposal, why CEC stands out, and why DEA chose a higher-priced offer in CEC. *See DigiFlight I*, 165 Fed. Cl. at 608. Thus, *DigiFlight I* does not guide the outcome in this case. *See id.*

Instead, the reasoning in this best value decision is closer to that seen in *RELI Group, Inc. v. United States*, in which the Court of Federal Claims upheld an agency's best value determination in a Subpart 8.4 procurement. 174 Fed. Cl. 630, 640 (2025) ("The Agency conducted a proper tradeoff, as shown in its final evaluation."). There, as in this procurement, the agency promised to make a best value tradeoff determination. *Compare RELI Grp.*, 174 Fed. Cl. at 640*, with* Tab 11, AR 288 ("Award will be based on the Best Value Trade-Off method."). The procuring agency did not directly compare the winning offer against other offers to document the tradeoff; rather, the agency wrote a "comparison among all offerors," which listed the strengths and weaknesses of each offer compared to the evaluation criteria. *RELI Grp.*, 174 Fed. Cl. at 640–41; *see also CAN Softtech, Inc. v. United States*, No. 24-670, 2024 WL 4434253, at *24 (Fed. Cl. Oct. 4, 2024) (upholding best value tradeoff under FAR Subpart 8.4 when CO "discussed the merits and adjectival ratings of each proposal in isolation," without direct comparison between offerors). The tradeoff contained sufficient explanation because it "compar[ed] the advantages and disadvantages of each of the eight offerors," and then awarded to the most advantageous offer, which was not the lowest-priced. *RELI Grp.*, 174 Fed. Cl. at 641. Here, similarly, DEA identified the advantages and disadvantages of each offer and named a single offer (CEC's) which exceeded requirements. *See* Tab 24, 1178–82. DEA then explained the reasoning behind its best value tradeoff when it said that CEC's "exceeding requirements offsets the higher price of their quote when compared to

lower priced proposals." Tab 24, AR 1189. The explanation of the tradeoff in this procurement, when combined with the detailed analysis of the technical evaluation earlier in the Award Decision Memo, is sufficient to meet the more limited standards of Subpart 8.4, as "rigorous detail" is not required. *See Integrated Fin. & Acct. Sols.*, 161 Fed. Cl. at 496 (quoting *22nd Century Techs., Inc. v. United States*, No. 21-1137, 2021 WL 3856038, at *10 (Fed. Cl. July 21, 2021)).

**IV. Injunctive Relief**

FYI argues that it is entitled to injunctive relief. Pl. MJAR at 44. FYI attached to its MJAR a declaration from [redacted], its Director of Contracts Management, claiming that a loss of this contract "will have a significant adverse impact on FYI's business." ECF No. 24-2 at 2 ¶ 5. Defendant opposes injunctive relief and argues that even if DEA violated procurement law, "there is no need for the Court to enjoin C. Evans from competition." Def. MJAR at 47. CEC asserts that if DEA's consideration of its modification violated the late-is-late rule, then "the Court's injunction must be broad and allow the DEA to consider all options for re-award . . ., including re-evaluation of all proposals as they are." CEC Reply at 19.

In bid protest cases, the Tucker Act provides this Court with the power to enter "any relief that the court considers proper, including declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2). The Court considers four factors when deciding whether to grant injunctive relief: (1) whether the plaintiff has succeeded on the merits, (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) whether the balance of hardships to the respective parties favors granting an injunction, and (4) whether the public interest is served by granting an injunction. *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009). As discussed above, FYI's protest succeeds on the merits, as DEA violated the late-is-late

rule in its consideration of CEC's modifications. Thus, this Court reviews the other three factors to determine whether injunctive relief is appropriate.

**A. <u>Irreparable Harm</u>**

FYI has established that it will suffer irreparable harm if injunctive relief is withheld. "'A party suffers irreparable harm when there is no adequate remedy' in the absence of an injunction." *Cosette Pharms., Inc. v. United States*, 179 Fed. Cl. 740, 762 (2025) (quoting *Frawner Corp. v. United States*, 161 Fed. Cl. 420, 462 (2022)). "The Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract." *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 494 (2013). When an agency improperly makes award to another offeror, a protestor "is unable to compete for the award and will potentially lose profits as a result." *Cosette Pharms.*, 179 Fed. Cl. at 762. FYI provides uncontroverted evidence that the loss of this contract will [redacted]. ECF No. 24-2 at 2–3 ¶¶ 6–7. Thus, FYI has demonstrated that it will suffer irreparable harm.

**B. <u>Balance of Hardships</u>**

"The balance of hardships inquiry requires a 'consideration of the harm to the [G]overnment.'" *Cosette Pharms.*, 179 Fed. Cl. at 762 (quoting *Frawner Corp.*, 161 Fed. Cl. at 462). Defendant never argues that injunctive relief will present hardship to DEA. *See* Def. MJAR at 47; Def. Reply at 30. FYI, the incumbent contractor, avers that it "is prepared to continue to provide these services . . . during the pendency of any reevaluation or competition for the solicited effort." ECF No. 24-2 at 3 ¶ 9. In contrast, without an injunction, FYI would be deprived of the opportunity to fairly compete for the award, because FYI has not had the opportunity to compete

under the rules that DEA promised to follow. Accordingly, the balance of hardships weighs in favor of granting an injunction.

### C. **Public Interest**

"It is axiomatic that 'the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid.'" *Cosette Pharms.*, 179 Fed. Cl. at 762 (quoting *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 (2000)). "An injunction preventing performance under an improperly awarded contract will serve the public interest by preserving that honest, open, and fair process." *Id.* (citing *Frawner Corp.*, 161 Fed. Cl. at 420). Defendant makes no argument concerning any harm that an injunction poses to the public interest. *See* Def. MJAR at 47; Def. Reply at 30. Accordingly, the public interest weighs in favor of an injunction, so that the procurement may proceed in accordance with law.

### D. **Scope of Injunction**

As all four factors weigh in Plaintiff's favor, the Court finds the entry of an injunction appropriate. "[T]he Court of Federal Claims has broad equitable powers to fashion an appropriate remedy." *Turner Constr. Co., Inc. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011). Indeed, the Tucker Act empowers this Court to "award any relief that [it] considers proper." 28 U.S.C. § 1491(b)(2).

Concerning the scope of injunctive relief, consistent with this Memorandum and Order the Court enjoins DEA from proceeding with its award to CEC under the present Request for Quotation to the extent the award is based on the unlawful consideration of CEC's late-received, modified quotation. The DEA shall otherwise retain discretion over its path forward for the procurement of Human Capital Support Services, if at all.

## CONCLUSION

Accordingly, for the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 24). The Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 30). The Court **GRANTS IN PART** and **DENIES IN PART** Intervenor-Defendant CEC's Cross-Motion for Judgment on the Administrative Record (ECF No. 28). Consistent with this Memorandum and Order, Defendant is **ENJOINED** from proceeding with its award to CEC under the present Request for Quotation to the extent the award is based on the unlawful consideration of CEC's modified quotation. The Clerk of Court is **DIRECTED** to enter Judgment accordingly and mark this case as closed.

The parties are directed to **CONFER** and **FILE** a Notice by **September 8, 2026**, attaching a proposed public version of this [redacted] Memorandum and Order, with any competition-sensitive or otherwise protected information redacted.

IT IS SO ORDERED.

*Eleni M. Roumel*
ELENI M. ROUMEL
Judge

August 24, 2026
Washington, D.C.